RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0031p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

No. 14-5800

*v.*

ROCKY JOE HOUSTON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 3:13-cr-00009—Danny C. Reeves, District Judge.

Argued: October 9, 2015

Decided and Filed: February 8, 2016

Before: ROGERS and DONALD, Circuit Judges, and ROSE, District Judge.[*]

_____

### COUNSEL

**ARGUED:** Steven R. Jaeger, THE JAEGER FIRM PLLC, Erlanger, Kentucky, for Appellant. David C. Jennings, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee. **ON BRIEF:** Steven R. Jaeger, THE JAEGER FIRM PLLC, Erlanger, Kentucky, for Appellant. David C. Jennings, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee.

ROGERS, J., delivered the opinion of the court in which DONALD, J., joined, and ROSE, D.J., joined in part. ROSE, D.J. (pp. 18–20), delivered a separate opinion concurring in all but Part II.A. of the majority opinion.

_____

[*]The Honorable Judge Thomas M. Rose, United States District Judge for the Southern District of Ohio, sitting by designation.

1

—————————

**OPINION**

—————————

ROGERS, Circuit Judge.   Rocky Houston appeals his conviction of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).   At trial, the primary evidence against Houston was video footage of his possessing firearms at his and his brother's rural Tennessee farm.   The footage was recorded over the course of ten weeks by a camera installed on top of a public utility pole approximately 200 yards away.   Although this ten-week surveillance was conducted without a warrant, the use of the pole camera did not violate Houston's reasonable expectations of privacy because the camera recorded the same view of the farm as that enjoyed by passersby on public roads.   Houston's remaining arguments on appeal— challenges to certain evidentiary decisions, to his classification as a "prohibited person" under § 922(g)(1), and to the reasonableness of his sentence—also lack merit.

**I.**

In 2012, the Roane County Sheriff's Department informed the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") that Rocky Houston was a convicted felon in open possession of firearms at his residence.   Houston had been convicted by a Tennessee jury of a felony in March 2010, although his conviction was still pending on direct appeal when the sheriff's department contacted the ATF and throughout the ATF's subsequent investigation.

Houston and his brother Leon Houston reside on the "Houston family farm," which is comprised of three adjacent properties.   Houston resides in a red brick building, Leon in a trailer, and Houston's adult daughter in a farmhouse.   Billboards and hand-painted signs critical of government officials and depicting the dead bodies of a law enforcement officer and his civilian ride-along companion (the murders of whom Houston and his brother were tried, but ultimately acquitted) hang approximately twenty yards off the road.   While the farm is not enclosed by fencing or other artificial barriers, blue tarps blocked views of the trailer's doors and foliage initially blocked views of Houston's house.

ATF agents first attempted to conduct drive-by surveillance of the farm. However, they were unable to observe for any length of time because their vehicles "[stuck] out like a sore thumb" at the rural property. As a result, on October 9, 2012, at the direction of the ATF and without a warrant, the utility company installed a surveillance camera on a public utility pole located roughly 200 yards from Leon's trailer. The camera broadcasted its recordings via an encrypted signal to an IP address accessed through a log-in and password. The camera could move left and right and had a zoom function. The ATF agents trained the camera primarily on Leon's trailer and a nearby barn because they understood that Houston spent most of his time in and around the trailer and occasionally slept there. At trial, an ATF agent (Special Agent Dobbs) testified that the view that the camera captured was identical to what the agents would have observed if they had driven down the public roads surrounding the farm.

Warrantless monitoring occurred for ten weeks, from October 10, 2012, until December 19, 2012. On December 19, 2012, this court issued *United States v. Anderson-Bagshaw*, 509 F. App'x 396 (6th Cir. 2012), in which we expressed "some misgivings" about the constitutionality of long-term warrantless surveillance of an individual's backyard via a pole camera. *Id.* at 405. In response, the ATF obtained a warrant for the continued use of the pole camera later on the same day that *Anderson-Bagshaw* was issued.

On January 11, 2013, ATF agents arrested Houston when he was away from the farm. No firearms were found on his person. On the same day, agents also executed search warrants for the three residences at the farm. Agents seized twenty-five firearms attributable to Houston and his brother: seventeen from Houston's house, five from Leon's trailer, and three from Leon's person. Houston was originally indicted for fourteen counts of violating § 922(g)(1). However, before trial, the Government moved to dismiss Counts 2–14 as multiplicitous and instead pursued a single count of possession of a firearm on or about January 11, 2013.

Before trial, the district court rejected all of Houston's various motions to suppress and motions in limine. First, the district court denied Houston's motion to suppress video footage obtained from the pole camera. The district court ruled that even if the long-term warrantless surveillance violated Houston's Fourth Amendment rights, the exclusionary rule would not bar admission of the evidence due to the good-faith exception. Additionally, regarding Houston's

argument that the video footage that was recorded after the agents obtained a warrant should be suppressed due to lack of probable cause supporting the warrant, the district court ruled that the warrant was supported by probable cause based on the previous warrantless footage as well as the statements from four individuals that Houston openly possessed firearms at his farm.

At trial, footage from the warrantless use of the camera was introduced to show Houston possessing firearms on seven dates during the ten-week surveillance. A post-warrant video of Houston with a firearm was also admitted. While some of the videos show Houston standing in fields or near barns with firearms, others capture him standing near the trailer with firearms.

Second, the district court denied Houston's motion to prohibit the Government from introducing video or photographic evidence purporting to show Houston possessing firearms absent a foundation that the firearm in the image is one of those confiscated on January 11, 2013. The district court reasoned that because Houston was charged with only one count of continuous possession of a firearm, video and photographic evidence of Houston possessing firearms in the weeks before his arrest would be relevant, highly probative, and not unduly prejudicial to proving that one count.

Third, the district court denied Houston's pretrial motion to prohibit the Government from introducing lay opinion testimony of Special Agent Dobbs regarding the footage. At trial, Houston also requested permission to *voir dire* Dobbs outside the presence of the jury, but the district court denied his request. During his testimony, Dobbs identified for the jury when the recordings showed Houston, his brother, or firearms. Dobbs had become familiar with the brothers through conducting drive-bys and personally observing the brothers, as well as through studying the surveillance footage. Dobbs was also permitted to testify that one of the firearms in the video was a "Ruger Mini 14" because he gained personal familiarity with that type of firearm when a relative owned one.

Fourth, the district court denied Houston's motion to dismiss the indictment. Houston argued that he was not a "prohibited person" under § 922(g)(1), because the appeal of his state felony conviction was still pending when the possessions of firearms alleged in the indictment occurred. Relying on *State v. Vasser*, 870 S.W.2d 543 (Tenn. Crim. App. 1993), the Tennessee

Rules of Evidence, the Tennessee Rules of Criminal Appellate Procedure, this court's precedent, and the legislative intent of § 922(g)(1), the district court ruled that Houston was indeed a "prohibited person" at the time of his alleged possessions of firearms, notwithstanding the pendency of the direct appeal of his predicate felony conviction.

A jury convicted Houston on March 19, 2014. At Houston's sentencing, the district court's Presentence Investigation Report set the base level offense at twenty-two due to the presence of an IMEZ Saiga, 7.62 caliber rifle; the Report then assigned six additional levels for the twenty-five firearms deemed to be in Houston's possession. Houston also had a criminal history category of II. Accordingly, the Guidelines imprisonment range was 87–108 months. The district court sentenced Houston to 108 months of imprisonment.

At the sentencing hearing, Houston objected to the six-level enhancement because he argued that he could not have had constructive possession over the three firearms found on his brother's person when the agents searched the residences on January 11, 2013. The district court rejected this argument because it found that Houston had "unfettered access" to the location where the firearms were kept.

Throughout the sentencing hearing (during which Houston chose to represent himself), Houston told the district court that he had contacted both Presidents Bush and Obama about his case and that he had filed a federal civil rights action against public officials in Roane County, Tennessee. The district court responded by asking Houston questions such as "How did it go for you when you wrote to President Obama? . . . Let me guess. He didn't respond to you?" Additionally, in determining the sentence, the district court took into account the billboards and signs posted at the farm as evidence of Houston's hatred for public officials and his "fortress mentality."

## II.

### A. No Fourth Amendment Violation

There is no Fourth Amendment violation, because Houston had no reasonable expectation of privacy in video footage recorded by a camera that was located on top of a public

utility pole and that captured the same views enjoyed by passersby on public roads. The ATF agents only observed what Houston made public to any person traveling on the roads surrounding the farm. Additionally, the length of the surveillance did not render the use of the pole camera unconstitutional, because the Fourth Amendment does not punish law enforcement for using technology to more efficiently conduct their investigations. While the ATF agents could have stationed agents round-the-clock to observe Houston's farm in person, the fact that they instead used a camera to conduct the surveillance does not make the surveillance unconstitutional.

This conclusion is supported by *California v. Ciraolo*, 476 U.S. 207 (1986), in which the Supreme Court upheld warrantless aerial observations of curtilage, explaining that the Fourth Amendment does not "preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible." *Id.* at 213. While several of the videos show Houston standing in open fields, an area in which the recordings certainly do not violate his reasonable expectations of privacy, *United States v. Dunn*, 480 U.S. 294, 300–03 (1987); *Anderson-Bagshaw*, 509 F. App'x 396, 403–04 (6th Cir. 2012), other videos show Houston standing near the trailer, an area that at least arguably qualifies as curtilage. Nonetheless, even assuming that the area near the trailer is curtilage, the warrantless videos do not violate Houston's reasonable expectations of privacy, because the ATF agents had a right to access the public utility pole and the camera captured only views that were plainly visible to any member of the public who drove down the roads bordering the farm. *See United States v. Jackson*, 213 F.3d 1269, 1280-81 (10th Cir.), *vacated on other grounds*, 531 U.S. 1033 (2000). Thus, Houston's Fourth Amendment rights were not violated, because he has no reasonable expectation of privacy in what he "knowingly exposes to the public." *Katz v. United States*, 389 U.S. 347, 351 (1967).

Houston argues that the immediate area around the trailer and Houston's home were not readily visible to passersby, because blue tarps blocked the trailer doors and foliage obstructed Houston's home. However, while the view of the trailer and his home may have been blocked, it was equally blocked from the view of the camera as from the view of passersby. There is no evidence that the camera was able to see through the tarps or into the interior of the trailer. The

Supreme Court in *Ciraolo* stated clearly that "the mere fact that an individual has taken measures to restrict some views of his activities" does not "preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible." 476 U.S. at 213.

Without citing the record, Houston alleges in his opening brief that it is "questionable" whether the view from atop the utility pole was the same as the view from the ground, and then later in his reply brief Houston alleges that the areas recorded by the camera definitely could not have been viewed by law enforcement officers standing on public ground. However, even if the view from a telephone pole somehow must be the same as the view from a public road, Special Agent Dobbs testified during the trial that the views from the camera and from the public roads were, in fact, the same, and there does not appear to be any evidence in the record to the contrary. The district court's factual finding in its order denying Houston's suppression motion that the camera recorded the same view enjoyed by an individual standing on public roads was thus not clearly erroneous.

Furthermore, the long length of time of the surveillance does not render the video recordings unconstitutionally unreasonable, because it was possible for law enforcement to have engaged in live surveillance of the farm for ten weeks. Although vehicles "[stuck] out like a sore thumb" at the property, the ATF theoretically could have staffed an agent disguised as a construction worker to sit atop the pole or perhaps dressed an agent in camouflage to observe the farm from the ground level for ten weeks. However, the Fourth Amendment does not require law enforcement to go to such lengths when more efficient methods are available. As the Supreme Court in *United States v. Knotts* explained, law enforcement may use technology to "augment[] the sensory faculties bestowed upon them at birth" without violating the Fourth Amendment. 460 U.S. 276, 282 (1983). The law does not keep the ATF agents from more efficiently conducting surveillance of Houston's farm with the technological aid of a camera rather than expending many more resources to staff agents round-the-clock to conduct in-person observations. *See id.* at 282–84. Nor does the law require police observers in open places to identify themselves as police; police may view what the public may reasonably be expected to view.

Moreover, even if it were not practical for the ATF to conduct in-person surveillance for the full ten weeks, it is only the possibility that a member of the public may observe activity from a public vantage point—not the actual practicability of law enforcement's doing so without technology—that is relevant for Fourth Amendment purposes. Our cases have so held. *See United States v. Skinner*, 690 F.3d 772, 779 (6th Cir. 2012); *United States v. Forest*, 355 F.3d 942, 951 (6th Cir. 2004), *vacated on other grounds*, *Garner v. United States*, 543 U.S. 1100 (2005). In *Forest*, DEA agents lost visual contact of the defendant as he drove on public highways. 355 F.3d at 951. To reestablish the defendant's location, the agents called the defendant's cell phone and hung up before it rang in order to "ping" the defendant's physical location. *Id.* Although the agents could not maintain visual contact, we held that the access of the defendant's cell phone data was not a search under the Fourth Amendment, because it was possible for any member of the public to view the defendant's car. *Id.* Similarly, in *Skinner*, we upheld the warrantless use of cell phone pinging to track the defendant's location on public roads even though law enforcement never made visual contact with the defendant and did not know his identity, because the defendant's movements "could have been observed by any member of the public." 690 F.3d at 779. Here, as in *Forest* and *Skinner*, the length of the use of the camera is not problematic even if the ATF could not have conducted in-person surveillance for the full ten weeks, because any member of the public driving on the roads bordering Houston's farm during the ten weeks could have observed the same views captured by the camera.

In arguing that the length of the surveillance period rendered the use of the pole camera unconstitutional, Houston relies on *Anderson-Bagshaw*, an unpublished opinion, in which we did not rule on the issue but expressed "some misgivings" about permitting warrantless pole camera surveillance of an individual's backyard for over three weeks. 509 F. App'x at 405; *see also* 509 F. App'x at 420–24 (Moore, J., concurring). Houston also cites *United States v. Jones*, in which five Justices appeared willing to rule that warrantless long-term GPS monitoring of an automobile violates an individual's reasonable expectation of privacy. 132 S. Ct. 945, 964 (Alito, J., concurring); *id.* at 955–56 (Sotomayor, J., concurring). However, unlike Justice Alito's concern in *Jones* that long-term GPS monitoring would "secretly monitor and catalogue every single movement" that the defendant made, *id.* at 964 (Alito, J., concurring), the surveillance here was not so comprehensive as to monitor Houston's every move; instead, the

camera was stationary and only recorded his activities outdoors on the farm.  Because the camera did not track Houston's movements away from the farm, the camera did not do what Justice Sotomayor expressed concern about with respect to GPS tracking: "generate[] a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations."  *Id.* at 955 (Sotomayor, J., concurring).  Indeed, we recognized as much in *Anderson-Bagshaw*, the case upon which Houston relies, when we stated that "it may be that the privacy concerns implicated by a fixed point of surveillance are not so great as those implicated by GPS tracking."  509 F. App'x at 405.  Thus, notwithstanding the concurrences in *Jones* and dicta in our unpublished opinion, the results in *Knotts*, *Forest*, and *Skinner* indicate that long-term warrantless surveillance via a stationary pole camera does not violate a defendant's Fourth Amendment rights when it was possible for any member of the public to have observed the defendant's activities during the surveillance period.

Moreover, if law enforcement were required to engage in live surveillance without the aid of technology in this type of situation, then the advance of technology would one-sidedly give criminals the upper hand.  The law cannot be that modern technological advances are off-limits to law enforcement when criminals may use them freely.  Instead, "[i]nsofar as respondent's complaint appears to be simply that scientific devices . . . enabled the police to be more effective in detecting crime, it simply has no constitutional foundation."  *Knotts*, 460 U.S. at 284.

Finally, given our holding that the agents did not need to obtain a warrant to conduct the video surveillance in the first place, Houston's argument that the post-warrant video evidence should be suppressed due to a lack of probable cause supporting the warrant is unavailing.  All of the pole camera recordings, both those obtained with and without a warrant, were properly admitted during Houston's trial.

**B. Video and Photographic Evidence of Firearms not Proven to Be Seized on January 11, 2013**

The district court also did not abuse its discretion in admitting video and photographic evidence obtained from the pole camera even though it could not be proved that the firearms in the images were the same firearms seized on January 11, 2013, because the evidence was

relevant and not unduly prejudicial in proving Houston's continuous and uninterrupted possession of firearms. Houston argues that absent a foundation that the firearm in the image is one of those confiscated on January 11, 2013, the introduction of videos or photographs would be irrelevant and would violate Federal Rules of Evidence 404(b) and 403.

Because Counts 2–14 were dismissed as multiplicitous, the district court correctly ruled that evidence of Houston's possessing firearms in the weeks leading up to his arrest was highly probative in proving the remaining count of continuous and uninterrupted possession. The district court also did not abuse its discretion in admitting the evidence because the indictment charges Houston with possession of one or more firearms "on or about" January 11, 2013. "On or about" indicates that time is not an essential element of the offense, so long as the unlawful conduct occurred "reasonably near" the date on the indictment. *United States v. Ford*, 872 F.2d 1231, 1236 (6th Cir. 1989). Therefore, the Government did not have to prove that Houston actually possessed firearms on January 11, 2013. *Id.* While an incident that occurred eleven months before the date on the indictment is not "reasonably near," *id.*, this court has upheld admitting evidence of events that took place thirty-three days and two weeks before the date on the indictment. *United States v. Hettinger*, 242 F. App'x 287, 295 (6th Cir. 2007); *United States v. Manning*, 142 F.3d 336, 338–40 (6th Cir. 1998). The images of Houston consistently possessing firearms on dates between ten and three-and-a-half weeks before the date on the indictment are more similar to the cases in *Hettinger* and *Manning* than the eleven-month gap in *Ford*. Accordingly, the images are relevant to proving the one count of continuous and uninterrupted possession "on or about" January 11, 2013.

In addition, the introduction of video and photographic evidence of firearms that were not proven to be seized on January 11, 2013, was not unfairly prejudicial. Evidence is unfairly prejudicial when it "tends to suggest decision on an improper basis," but is not unfairly prejudicial when it only damages the defendant's case due to the legitimate probative force of the evidence. *United States v. Bonds*, 12 F.3d 540, 567 (6th Cir. 1993) (quoting *United States v. Schrock*, 855 F.2d 327, 333 (6th Cir. 1988)). Because the damage that the evidence caused to Houston's case—that the jury would be more likely to find Houston guilty of continuous and uninterrupted possession of a firearm "on or about" January 11, 2013, after viewing images of

his possessing firearms in the weeks leading up to his arrest—results from the legitimate probative force of the evidence, the evidence was not unfairly prejudicial.

Furthermore, as the district court explained, because the images were properly introduced as substantive evidence of Houston's charged violation of § 922(g)(1), they are not propensity evidence and his 404(b) arguments are thus misplaced.

## C. Testimony of Special Agent Dobbs

The district court also did not abuse its discretion in permitting Special Agent Dobbs to offer his lay opinions identifying Houston and firearms in the videos, because Dobbs was better able to identify Houston and the firearms in the less-than-perfect quality videos than the jury due to Dobbs' personal familiarity with both Houston and firearms generally. Houston argues that Dobbs should not have been permitted to testify, because Dobbs did not observe the events firsthand. However, Federal Rule of Evidence 701 permits a lay witness to identify a defendant in a photograph when the witness is more likely than the jury to identify the individual. *United States v. Dixon*, 413 F.3d 540, 545 (6th Cir. 2005). As we explained in *Dixon*, factors relevant to admitting lay identification testimony include whether the witness is generally familiar with the defendant's appearance, whether the witness was familiar with the defendant's appearance at the time the photograph was taken or when the defendant was dressed similarly to the individual in the photograph, whether the defendant disguised his appearance at the time of the offense, whether the defendant has since altered his appearance, whether the photograph is of poor quality, and whether the photograph only shows a partial view of the defendant. *Id.* Furthermore, a reviewing court should particularly defer to the decision by the district court to admit (as opposed to exclude) lay identification testimony because someone who is personally familiar with an individual is presumptively better able to identify the individual in a photograph than a juror. *Id.* at 547 (Rogers, J., concurring).

Here, Dobbs became familiar with Houston—including his typical dress and mannerisms—by observing him in person before Dobbs viewed the videos. Additionally, the video would occasionally "jump" and the images could be "grainy" when the zoom function was used. Accordingly, based on the factors given in *Dixon* and the great level of deference afforded

to the district court's evidentiary decisions, the district court did not abuse its discretion. Similarly, the district court did not abuse its discretion when it permitted Dobbs to identify firearms in the video based on his general familiarity with firearms and the Ruger Mini 14 in particular. Just as Dobbs was more likely to be able to identify Houston in the poor quality videos due to his familiarity with Houston, Dobbs' general familiarity with firearms and the Ruger Mini 14 (which likely exceeded that of the average juror) also made him more likely to be able to identify firearms in the video.

Houston also argues that the district court abused its discretion by refusing to allow Houston's counsel to *voir dire* Dobbs outside the presence of the jury. However, any error in refusing *voir dire* was harmless because Dobbs properly testified as a lay witness.

**D. "Prohibited Person" Under 18 U.S.C § 922(g)(1)**

Houston's non-evidentiary challenge to his conviction is also without merit. Even though Houston's state felony conviction was pending on direct appeal at the time of his alleged possessions of firearms, Houston was nonetheless a prohibited person under § 922(g)(1). Houston was "convicted" under both possible definitions of "conviction" in Tennessee law and no Tennessee case or statute provides that a person's status as "convicted" is affected by the pendency of a direct appeal for purposes analogous to the loss of the right to possess firearms under § 922(g)(1).

> Section 922 (g)(1) states that:
>
> It shall be unlawful for any person . . . *who has been convicted* in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to . . . possess . . . any firearm or ammunition . . . .

(emphasis added). 18 U.S.C. § 921(a)(20) further provides that "[w]hat constitutes a conviction [for purposes of § 922(g)(1)] shall be determined in accordance with the law of the jurisdiction in which the proceedings were held." Because Houston's underlying felony was adjudicated in Tennessee, Tennessee law governs the definition of "convicted." The Tennessee Code does not define "conviction"; accordingly, Tennessee case law determines the definition.

Under Tennessee law, the meaning of "conviction" depends on the context in which it is used. *State v. Vasser*, 870 S.W.2d 543, 546 (Tenn. Crim. App. 1993). Two meanings of "conviction" exist under Tennessee law. *Rodriguez v. State*, 437 S.W.3d 450, 453 (Tenn. 2014) (citing *Vasser*, 870 S.W.2d at 545). First, the "general" meaning of conviction refers only to "the establishment of guilt by a guilty plea or verdict" and is "independent of sentence and judgment." *Id.* (citing *Vasser*, 870 S.W.2d at 546). Tennessee courts have determined that the "general" meaning of conviction applies when the statutory language denotes a stage of the trial process or is used "in connection with the successive steps in a criminal case." *Vasser*, 870 S.W.2d at 546. Second, the "technical" meaning of conviction requires both a guilty verdict and the adjudication of a sentence by the court. *Id.* Under the Tennessee Rules of Criminal Procedure, the "technical meaning" of conviction is referred to as a "judgment of conviction." *Id.* at 545 (citing Tenn. R. Crim. P. 32(e)). Absent a statutory definition to the contrary, the "technical meaning" is typically used when referring to future consequences that result from conviction, such as civil disabilities. *Id.* at 546 (citing *Vasquez v. Courtney*, 537 P.2d 536, 537-38 (Or. 1975)). Regardless of whether the "general" or "technical" meaning of conviction applies to § 922(g)(1), Houston was "convicted" of a felony under either meaning because a jury issued a guilty verdict and the state court formally sentenced him to one year of imprisonment for the felony. *State v. Houston*, No. E2011-01855-CCA-R3-CD, 2013 WL 500231, at *1 (Tenn. Crim. App. Feb. 11, 2013).

No Tennessee court has held that a person is not considered "convicted" under the law simply because an appeal has been filed, regardless of whether the person's conviction was in the "general" or the "technical" sense. The only case that has considered whether an individual is considered "convicted" during the pendency of an appeal held that the individual did remain "convicted" throughout the duration of the appeal. *State ex rel. Barnes v. Garrett*, 188 S.W. 58, 60 (Tenn. 1916). In *Garrett*, the Tennessee Supreme Court held that a pardon granted while a conviction is on direct appeal is valid under the governor's power in the Tennessee Constitution to grant pardons "after conviction." *Id.* The attorney general argued that the pardon was not issued "after conviction," and therefore was invalid, because the appeal suspended the judgment. *Id.* at 59. After determining that the word "conviction" in the Tennessee Constitution was used in its "general" sense—meaning that the individual's conviction was unaffected by the

imposition or suspension of a sentence—the court ruled that although the appeal suspended the judgment, while on appeal "the defendant stands convicted, unless this court finds error and awards a new trial." *Id.* at 60.

Treating Houston as a prohibited person is also consistent with federal precedent regarding § 922(g)(1). In *Lewis v. United States*, 445 U.S. 55 (1980), the Supreme Court held that the use of an allegedly invalid state felony conviction as the predicate offense under a similar statute did not violate the Due Process Clause of the Fifth Amendment. *Id.* at 64–66. Similarly, we have held that § 922(g)(1) only focuses on the status of the defendant at the time of the possession of the firearm. *United States v. Morgan*, 216 F.3d 557, 565–66 (6th Cir. 2000). We have further recognized that Congress, by enacting § 922, intended to create a class of "presumptively dangerous" individuals that is not limited to only those validly convicted. *Id.* at 566. For example, in *United States v. Olender*, 338 F.3d 629 (6th Cir. 2003), we upheld a defendant's conviction for violating § 922(g)(1) even though the state court realized it had erroneously entered the defendant's predicate convictions as felonies and later entered a corrected judgment changing the convictions to misdemeanors. *Id.* at 631–32. Thus, even if the Tennessee Court of Criminal Appeals had ultimately reversed Houston's conviction, our reasoning in *Morgan* and *Olender* indicates that Congress nonetheless intended for Houston's possessions of firearms during the pendency of his appeal to be prohibited by § 922(g)(1).

Houston argues that his conviction is not "final" under Tennessee law and therefore cannot serve as a predicate felony for § 922(g)(1). However, Houston's arguments that his conviction is not "final" are unfounded because the Tennessee Rules of Appellate Procedure provide that a criminal defendant may only appeal once the trial court enters a "final" judgment of conviction, *State v. Comer*, 278 S.W.3d 758, 760–61 (Tenn. Crim. App. 2008); the very fact that Houston was able to appeal demonstrates that his conviction was "final" under Tennessee law. Likewise, the Tennessee Rules of Evidence further indicate that a conviction is "final" notwithstanding the pendency of an appeal because an individual can be impeached with evidence of a conviction even if an appeal is pending. Tenn. R. Evid. 609(e).

Houston claims that under *Wilkerson v. Leath*, No. 3-93-06, 2012 WL 2361972 (Tenn. Ct. App. Mar. 6, 2012), a conviction is not "final" under Tennessee law until all appeals are

exhausted. However, *Leath* only dealt with the use of a criminal conviction for the purposes of collateral estoppel (or "issue preclusion") in a civil case. 2012 WL 2361972, at *6. The case did not make any attempt to define "conviction." Instead, the *Leath* court limited its inquiry to "the issue of whether the judgment, while pending on appeal . . . was final for collateral estoppel purposes." *Id.* It is understandable why, as a policy matter, Tennessee would choose to require all appeals to be exhausted before a judgment may be used for collateral estoppel; such a rule avoids inconsistent results when the later reversal of a judgment affects the outcome of the case in which the judgment was used as collateral estoppel. Restatement (Second) of Judgments § 13 cmt. f (1982). However, § 922(g)(1) does not share the same policy rationale. As explained above, Congress did not limit the class of prohibited persons under § 922(g)(1) to those validly convicted, *Morgan*, 216 F.3d at 566; thus, § 922(g)(1) does not share the concern that prohibiting a person from possessing firearms could lead to "inconsistencies" when that person's underlying felony conviction is later reversed.

Houston's remaining arguments that his conviction is not "final" are also without merit. He relies on *State v. Scarborough*, 181 S.W.3d 650 (Tenn. 2005), which holds that the Tennessee Constitution does not permit the prosecution to use collateral estoppel against the defendant in order to establish an essential element of the offense. *Id.* at 652. *Scarborough* determined only the extent of a defendant's rights to a jury trial under the Tennessee Constitution, and nothing in the opinion attempts to define "conviction." *Id.* at 658. Houston also argues that we should defer to a Tennessee state judge's statement that Houston's felony judgment was "not a final order." However, the statement is from an order denying Houston post-conviction relief because his application to the Tennessee Supreme Court to review his conviction was still pending, and the statement thus indicates only that Houston may not pursue post-conviction relief under Tennessee law before exhausting all direct appeals. Finally, Houston relies on *United States v. Pugh*, 142 F.3d 438, 1998 WL 165143 (6th Cir. 1998), in which we held in an unpublished opinion that the word "final" in a statutory sentencing enhancement provision should be interpreted as "meaning when direct appeals have been exhausted." *Id.* at *6. The rationale behind this interpretation is to avoid the need to resentence the defendant should one of the underlying prior offenses be reversed on appeal. *See United States v. Morales*, 854 F.2d 65, 69

(5th Cir. 1988). Section 922(g)(1) does not share this efficiency rationale; indeed, as explained in *Morgan*, Congress intended quite the opposite. *See* 216 F.3d at 566.

**E. Reasonableness of Houston's Sentencing**

Finally, the district court did not abuse its discretion in sentencing Houston, because it acted procedurally and substantively reasonably and without bias in attributing all twenty-five firearms to Houston and in weighing relevant sentencing factors. First, the imposition of the six-level enhancement was procedurally reasonable because the district court could reasonably conclude that Houston had constructive possession of all twenty-five firearms. Constructive possession occurs when a person has the power and intention to exercise dominion and control over an object. *United States v. Bailey*, 553 F.3d 940, 944 (6th Cir. 2009). The possession may be joint, but the Government must prove a nexus between the defendant and the object. *Id.* at 945; *United States v. Craven*, 478 F.2d 1329, 1333 (6th Cir. 1973). In this case, the district court could conclude that Houston had constructive possession of all the firearms because it pointed to specific aspects of the record that illustrate that Houston shared all twenty-five firearms with Leon and had "unfettered access" to the location where the firearms were kept. In particular, the district court relied on the videos showing Houston and Leon using firearms together, the fact that Houston came and went freely from the trailer, and the fact that Houston's son claimed ownership for one of the firearms recovered from Leon's person.

Houston argues that he could not have had constructive possession of the three firearms recovered from Leon's person, because the Government failed to show through "credible evidence" that Houston previously had a nexus with or access to the three firearms seized from Leon's person. However, Houston does not point to anything in the record that rebuts the district court's findings that the brothers shared all of the weapons or that Houston had unfettered access to all of the weapons. Although Leon was carrying the three firearms at the exact moment the agents arrived, his temporary actual possession does not negate the conclusion that Houston also had constructive possession of the firearms.

Second, the record does not indicate that the district court was personally biased against Houston. Houston argues that the district court's asking of questions such as "How did it go for

you when you wrote to President Obama?" illustrates an unlawful bias. However, the questioning merely appears designed to demonstrate to Houston the frivolity of some of his actions and does not rise to the level of bias that would render the sentencing judgment invalid. Such questioning is a far cry from the judge's actions in *Knapp v. Kinsey*, 232 F.2d 458 (6th Cir. 1956), a case cited by Houston, in which the trial judge "took an active part in assisting the plaintiffs in presenting their case and in proving their contentions." *Id.* at 464.

Third, the sentence was within the Guidelines range and therefore is presumptively reasonable. *United States v. Vonner*, 516 F.3d 382, 389–90 (6th Cir. 2008) (en banc). In arguing that his sentence was nonetheless unreasonable, Houston alleges that the district court placed undue weight on the billboards and signs posted at the farm. The district court considered the billboards during sentencing and expressed concern that the billboards demonstrated hatred towards public officials and a "fortress mentality." However, there is no indication that the weight afforded by the district court was unreasonable or undue. As we have previously explained, "[t]hat the court did not weigh the factors raised by Defendant in the manner that he would have liked to have had them weighed does not indicate that the court acted improperly or disregarded Defendant's arguments." *United States v. Hogan*, 458 F. App'x 498, 504 (6th Cir. 2012).

## III.

The judgment of the district court is affirmed.

---

**CONCURRENCE**

---

ROSE, District Judge.   I concur in the result of the majority opinion affirming Defendant's conviction and sentence for possessing firearms in violation of 18 U.S.C. § 922(g)(1) on January 11, 2013.   While I concur in full with sections I, III, and parts B, C, D, and E of section II, I am not convinced of the reasoning behind part II A.

The lead opinion posits that "the ATF . . . could have staffed an agent disguised as a construction worker to sit atop the pole or perhaps dressed as an agent in camouflage to observe the farm from ground level for ten weeks."   While *United States v. Skinner*, 690 F.3d 772, 780 (6th Cir. 2012), implies that the actual practicability of law enforcement observing activity from a public vantage point may not be relevant, this Court has also sifted from the panoply of opinions in *United States v. Jones* the concern that long-term non-human surreptitious surveillance "is worrisome because 'it evades the ordinary checks that constrain abusive law enforcement practices: "limited police resources and community hostility."'" *United States v. Anderson-Bagshaw*, 509 F. App'x 396, 422 (6th Cir. 2012)(quoting *United States v. Jones*, 565 U.S. ——, 132 S. Ct. 945, 956, 181 L.Ed.2d 911 (2012) (Sotomayor, J., concurring) (quoting *Illinois v. Lidster*, 540 U.S. 419, 426, 124 S. Ct. 885, 157 L.Ed.2d 843 (2004))).

Also, I find unconvincing the claim that, because this case involves a camera focused on Defendant's house, and not a monitor affixed to a car, the Government cannot gather "a wealth of detail about [defendant's] familial, political, professional, religious, and sexual associations" 132 S. Ct. at 955.   Here, familial relations with Defendant's brother and daughter were studied. Surely, in most cases, ten weeks of video surveillance of one's house could reveal considerable knowledge of one's comings and goings for professional and religious reasons, not to mention possible receptions of others for these and possibly political purposes.   Also, by constant surreptitious technological viewing of Defendant's house, the Government knew Defendant "occasionally slept" in his trailer.   The privacy concerns implicated by a fixed point of surveillance are equal, if not greater, when it is one's home that is under surveillance.

Finally, I do not have the same concern that "if law enforcement were required to engage in live surveillance without the aid of technology in this type of situation, then the advance of technology would one-sidedly give criminals the upper hand." Expediency in this particular situation is not our concern. It is for the police to work within constitutionally permitted means. Fortunately, no one proposes that law enforcement should "be powerless to thwart such behavior." Law enforcement would have the power to obtain a search warrant, returning to them the upper hand.

In this case, it is the search warrant eventually obtained by law enforcement that carries the day. "[T]he untainted portions of the affidavit were sufficient to motivate the [legal] search and would have been sufficient to convince a neutral magistrate of the existence of probable cause." *United States v. Bowden*, 240 F. App'x 56, 61-62 (6th Cir. 2007)(quoting *United States v. Keszthelyi*, 308 F.3d 557, 575 (6th Cir.2002)).

The affidavit supporting the December 19, 2012 application for a search warrant to monitor the house remotely recounts how Defendant was convicted of felony evading arrest in 2004. 3:13-cr-010, Doc. 17-4, PageID# 312. The application further recounts how, while Defendant and his brother were acquitted of murder for the shooting of a Roane County Sheriff's Deputy and his ride-along companion in 2006, they fired 22 shots from an assault rifle and eight rounds from a handgun in what they portrayed at trial as self-defense. A sister admitted that in January 2012 she purchased ammunition for Leon Houston. *Id.* PageID# 313. A confidential informant testified that the two brothers used identical weaponry, to allow sharing ammunition. *Id.* PageID# 314. Another sister reported in December 2011 that there were numerous firearms on the property, including an assault rifle, other long guns and handguns. *Id.* PageID# 312. Finally, a home health care nurse, tending to the Houston's now-deceased father, reported that she observed multiple firearms on the property, including long guns and pistols. *Id.* PageID# 313. The January 11, 2013 application to enter and search the property contained the same allegations. *Id.* Doc. 17-2.[1] The untainted portions of the affidavit were clearly sufficient to

---

[1]Firearms "are durable goods and might well be expected to remain in a criminal's possession for a long period of time." *United States v. Powell*, 603 F. App'x 475, 478 (6th Cir. (2015)(quoting *United States v. Pritchett*, 40 F. App'x 901, 906 (6th Cir. 2002)).

motivate a legal search and would have been sufficient to convince a neutral magistrate of the existence of probable cause.

Similarly, the admission as evidence at trial from video surveillance taken prior to December 19, 2013 if unconstitutional, was harmless. "To determine whether the error was harmless under *Chapman* [*v. California*, 386 U.S. 18 (1967),] the question [a] court must ask is whether, absent the improperly admitted [evidence], it is clear beyond a reasonable doubt that the jury would have returned a verdict of guilty." *United States v. Wolf*, 879 F.2d 1320, 1324 (6th Cir.1989). Here, the evidence is that of guns, in the trailer of Defendant, a felon. There was video of Defendant on his property in possession of a gun on the day in question obtained pursuant to a warrant. It is clear beyond a reasonable doubt that the jury would have returned a verdict with or without the pre-warrant video.

Whether or not there is a Constitutional right not to have the Government focus a remotely operated surveillance device on one's house for ten-week stretches without a warrant, any error was harmless, because the search warrant application would have been approved absent any potentially prohibited evidence and the other evidence that Defendant possessed a firearm on January 11, 2013 was overwhelming. I concur in the judgment affirming Defendant's conviction and in all other respects of the opinion.