RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0109p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

No. 18-1821

CHRISTOPHER PAYTON MAY-SHAW,

*Defendant-Appellant*.

───────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:17-cr-00057-1—Paul Lewis Maloney, District Judge.

Argued:  January 28, 2020

Decided and Filed:  April 8, 2020

Before: MERRITT, CLAY, and BUSH, Circuit Judges.

───────────────

## COUNSEL

───────────────

**ARGUED:**  Patrick J. Hanley, Covington, Kentucky, for Appellant.  Tonya R. Long, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.  **ON BRIEF:** Patrick J. Hanley, Covington, Kentucky, for Appellant.  Sally J. Berens, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.  Christopher Payton May-Shaw, Sandstone, Minnesota, pro se.

───────────────

## OPINION

───────────────

JOHN K. BUSH, Circuit Judge.  Christopher May-Shaw was sentenced to 144 months in prison after he entered a conditional guilty plea to a charge of conspiracy to distribute cocaine.

The conviction arose from police surveillance of a parking lot near his apartment building and a covered carport next to that building, where May-Shaw parked his BMW, one of his several vehicles. The surveillance lasted for twenty-three days and used a camera affixed to a telephone pole on a public street and cameras in a surveillance van parked in the parking lot. After witnessing May-Shaw engage in several suspected drug deals, the police used a drug-detecting dog to sniff the BMW. The dog indicated the presence of narcotics in the vehicle. Based on the dog sniff and the surveillance, the officers obtained a search warrant for May-Shaw's apartment and all of his vehicles. The search found evidence of drug distribution, including cash, wrappers, and cocaine. The district court denied his motion under the Fourth Amendment to suppress the evidence from his apartment and vehicles. May-Shaw then entered a conditional guilty plea for conspiracy to distribute cocaine, but he preserved the right to appeal the denial of his motion to suppress.

As explained below, May-Shaw did not have a reasonable expectation of privacy in the carport such that police surveillance constituted a search in violation of the Fourth Amendment. Nor was the carport within the curtilage of his apartment such that the dog sniff was unconstitutional. Therefore, we **AFFIRM** the district court's denial of May-Shaw's motion to suppress.

## I.

In December 2015, the City of Grand Rapids Police Department began investigating May-Shaw for suspected involvement in drug trafficking. The Department had received tips from Silent Observer—an organization that receives anonymous information from the public— describing vehicles May-Shaw was using to transport drugs and a specific bag where he kept drugs, money, and a gun. A criminal history check on May-Shaw revealed that he had one felony firearm conviction and two felony drug convictions. Based on all of this information, the Grand Rapids police decided to conduct surveillance of the exterior of May-Shaw's apartment building and the parking lot of the apartment complex.

The apartment where May-Shaw lived is one of several units in the complex, which itself abuts a communal parking lot. In the parking lot are covered carports, the interiors of which are

easily viewable from a public vantage point on Norman Drive, a road outside of the parking lot. May-Shaw often parked his vehicles under a covered carport close to the entrance to his apartment building. Nothing in the record indicates whether the carport was specifically assigned to him, or if he had just consistently parked there.

The carport is next to a parking lot that is accessible only from Norman Drive, and that entrance affords almost complete visibility of the lot and adjacent apartment complex. The owner of the complex gave police permission to conduct physical and video surveillance of the lot. They had a good view, for only a line of trees obstructs the parking lot from public view on the road, and there was no foliage obstructing the view in February 2016, when the surveillance occurred.

Most of the stakeout, lasting several weeks, was done from a van using remotely operated cameras. Officers would park the van in the lot, moving its location every day or two. Through this method, police observed May-Shaw loading and unloading drugs and cash from his BMW and engaging in what officers believed to be drug deals in the parking lot.

In addition to their surveillance from the van, on January 26, 2016, police installed a camera on a telephone pole on Norman Drive. Officer Mesman, the principal investigator in May-Shaw's case, testified as to the specifics of the pole camera. According to Mesman, the camera was affixed to the pole approximately twenty feet from the ground, and could pan from side to side and up and down. The camera, which recorded continuously for twenty-three days, could produce video as well as still shots. Though officers did not monitor the footage continuously in real time, they reviewed the footage they missed by watching the recorded video.

The pole-camera and van-camera footage captured May-Shaw engaging in what the officers suspected were drug transactions in the parking lot. They based this conclusion on observations of May-Shaw making brief contact with people inside their vehicles, during which time he and the person in the car exchanged something. Also, on several occasions May-Shaw retrieved what appeared to be evidence of drug distribution from his vehicles. For example, on February 17, 2016, officers observed him lean into the front passenger side of one of his vehicles and remove cash and a bag of suspected drugs, hide the items under his jacket, and carry them

inside the apartment.  The next day, officers watched May-Shaw reach into the back of his car and remove a large stack of cash, which he also took inside the apartment.  Soon thereafter, the officers saw him put another two bags, which they also suspected contained drugs and cash, in the trunk of his BMW.

After witnessing such suspected drug transactions, the officers called in a K-9 unit for a drug-detecting dog sniff of the BMW, where the officers had just seen May-Shaw stash the bags. When the dog circled the BMW, which was parked directly under the carport, it alerted the officers to the odor of narcotics.

Based on the surveillance and dog sniff, the officers sought a search warrant.  The police relied primarily on the footage from the pole camera and the surveillance van, which showed different angles of the same conduct described earlier.  A state magistrate judge authorized a search warrant for the apartment and three vehicles connected to May-Shaw.  The apartment search resulted in seizure of almost $2,000 in cash, a gun, drug paraphernalia and packaging material, and nearly a pound of marijuana.  In their search of the BMW, police found a kilogram of cocaine, some fentanyl, and over $200,000 in cash.  The search of one of May-Shaw's other vehicles, a Chevrolet Tahoe, turned up another $486 in cash.  Neither May-Shaw nor his third car was present when the police conducted the search.  May-Shaw was arrested some months later in Brooklyn, New York.

A federal grand jury in the U.S. District Court for the Western District of Michigan returned a superseding indictment charging May-Shaw with conspiracy to distribute and possess with intent to distribute cocaine, possession with intent to distribute cocaine, and maintaining drug-involved premises, in violation of 21 U.S.C. §§ 846, 841(b)(1)(A) and 856.

May-Shaw moved the district court to suppress the evidence seized pursuant to the search warrant, arguing that the warrantless surveillance through the pole camera and the warrantless sniff by the drug-detecting dog of the BMW constituted unconstitutional warrantless searches. The district court denied the motion, holding that (1) May-Shaw had no reasonable expectation of privacy in the parking lot; (2) the area surveilled by the pole camera was not constitutionally protected curtilage of the apartment; (3) the dog sniff was permitted under the Fourth

Amendment; and (4) even if the dog sniff was unconstitutional, the remainder of the information in the warrant affidavit was sufficient to support probable cause for the search warrant.

May-Shaw entered a conditional guilty plea to the conspiracy count, preserving the right to appeal the denial of the motion to suppress. He was sentenced to 144 months in prison. He filed this timely appeal.

## II.

When reviewing a district court's decision on a motion to suppress, we use a mixed standard of review, reviewing findings of fact for clear error and conclusions of law de novo. *United States v. Hines*, 885 F.3d 919, 924 (6th Cir. 2018). Evidence should be viewed in the light most favorable to the district court's conclusions. *United States v. McCraney*, 674 F.3d 614, 616–17 (6th Cir. 2012). "[A] denial of a motion to suppress will be affirmed on appeal if the district court's conclusion can be justified for any reason." *United States v. Moorehead*, 912 F.3d 963, 966 (6th Cir. 2019) (alteration in original) (quoting *United States v. Pasquarille*, 20 F.3d 682, 685 (6th Cir. 1994)).

May-Shaw's motion to suppress invokes the Fourth Amendment, which protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. May-Shaw maintains that his Fourth Amendment rights were violated when the police conducted warrantless surveillance of the carport outside of his apartment, and when they used a drug-detecting dog to sniff his car that was parked in that carport. We address each argument in turn.

## A.

May-Shaw argues that the district court erred in finding that the long-term surveillance of the carport did not constitute a search. Under Fourth Amendment jurisprudence, there are two ways in which government action may constitute a search. First, when the government gains information by physically intruding into a constitutionally protected area—namely, "persons, houses, papers, and effects," U.S. Const. amend. IV—"'a search within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'" *Morgan v. Fairfield Cty.*, 903 F.3d 553,

561 (6th Cir. 2018) (quoting *Florida v. Jardines*, 569 U.S. 1, 5 (2013)).  Second, as articulated by the Supreme Court, a search occurs when "a government official invades an area in which 'a person has a constitutionally protected reasonable expectation of privacy.'"  *Taylor v. City of Saginaw*, 922 F.3d 328, 332 (6th Cir. 2019) (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)).  Under the latter framework, there are two requirements for a government intrusion to constitute a Fourth Amendment search: first, a person must exhibit "an actual (subjective) expectation of privacy" in the place or thing searched; second, the expectation is one "that society is prepared to recognize as 'reasonable.'"  *Katz*, 389 U.S. at 361.

Because the officers' use of the pole camera did not involve any sort of physical intrusion into a constitutionally protected area, May-Shaw must show that he had a reasonable expectation of privacy in the carport.  Cobbling together dicta from several Fourth Amendment cases, he argues that, although police may permissibly observe the curtilage of a home for a short period of time, for example with an aerial flyover, *see California v. Ciraolo*, 476 U.S. 207, 213 (1986), long-term video surveillance of a home's curtilage is problematic under the Fourth Amendment, *see United States v. Anderson-Bagshaw*, 509 F. App'x 396, 405 (6th Cir. 2012).  There is at least some support for that proposition, as this court and five Justices of the Supreme Court have noted concerns about the problems with long-term warrantless surveillance.  *See id.*; *see also United States v. Jones*, 565 U.S. 400, 415, 429–30 (2012) (Sotomayor, J., concurring and Alito, J., concurring).

Although this argument may be compelling in theory, as applied here, it is foreclosed by this circuit's case law, which has consistently held that this type of warrantless surveillance  does not violate the Fourth Amendment.  For example, in *United States v. Houston*, we held that affixing a video camera to the top of a utility pole to record the defendant's front porch over a ten-week period did not violate the defendant's Fourth Amendment rights because "agents only observed what [the defendant] made public to any person traveling on the roads" surrounding his home.  813 F.3d 282, 288 (6th Cir. 2016).  We rejected the defendant's claim that the length of the period of monitoring made the surveillance constitutionally unreasonable, reasoning that it is the possibility—not the practicability—that the police could have themselves sat atop the utility pole and observed the same view for every waking moment of a ten-week period that is critical.

*Id.* at 289–90. That reasoning was applied in *United States v. Powell,* in which we held that the warrantless surveillance of three buildings through the installation of video cameras on three public utility poles, for periods of up to 90 days each, did not violate the defendants' Fourth Amendment rights. 847 F.3d 760, 773 (6th Cir. 2017). And, even assuming that May-Shaw is correct that the carport constitutes the curtilage of his apartment—an argument that we find unpersuasive, for reasons discussed below—that is of no consequence to the constitutional analysis of the video surveillance. We held in *Houston* that warrantless video surveillance of the defendant's front porch, which is unquestionably within the curtilage of his home, did not violate his reasonable expectation of privacy because the camera "captured only views that were plainly visible to any member of the public who drove down the roads bordering" his home. *Houston*, 813 F.3d at 288.

May-Shaw contends that the pole camera did not provide the same vantage point that was readily accessible from the street.[1] The district court, however, held that the area surveilled by the pole camera was readily accessible from a public vantage point. This is a factual finding that is reviewed for clear error. Officer Mesman testified that the vantage point from the pole camera was the same as the vantage point from the street, and nothing in the record contradicts that assertion. Therefore, the district court's factual finding that the pole camera recorded the same view enjoyed by an individual standing on Norman Avenue was not clearly erroneous.

Furthermore, the surveillance footage and photos here did not "generate[] a precise, comprehensive record of [May-Shaw's] public movements that reflects a wealth of detail about [his] familial, political, professional, religious, and sexual associations," *Jones*, 565 U.S. at 415

---

[1]The parties dispute which camera or cameras recorded the illicit activity. May-Shaw claims that the footage was captured by the pole camera, whereas the government maintains that the incriminating footage came from the cameras in the van. Though the officers did not keep a log of which images came from each camera, a comparison of two sets of photos available at R. 60-2, PageID 236–37 clearly indicates that the close-up images showing May-Shaw engaged in suspected drug transactions did not come from the more remote camera affixed to the telephone pole. May-Shaw does not point to anything other than the lack of a log to suggest that the images did not come from the surveillance van cameras. Appellant Br. at 13. If the images were in fact recorded from the surveillance van rather than from the pole camera, then this is a simple case of police surveillance from a publicly accessible area, in which the police had permission to conduct the surveillance. This does not raise the same Fourth Amendment concerns. *See United States v. Gooch*, 499 F.3d 596, 602–03 (6th Cir. 2007) (noting that an individual does not have a reasonable expectation of privacy in an openly accessible parking lot, and so police surveillance in that lot did not constitute a search).

(Sotomayor, J., concurring), which could raise significant Fourth Amendment concerns. Rather, the footage and photos only revealed what May-Shaw did in a public space—the parking lot. They captured images of May-Shaw moving things from his car to his apartment. The video showed when he arrived and left the apartment. In other words, the cameras observed only what "was possible for any member of the public to have observed . . . during the surveillance period." *Houston*, 813 F.3d at 290.

May-Shaw has not demonstrated that when the government surveilled the carport for twenty-three days, it violated his reasonable expectation of privacy and thus conducted an unconstitutional search. We find no error in the district court's judgment that the pole-camera surveillance did not violate May-Shaw's Fourth Amendment rights.

**B.**

May-Shaw also argues that the district court should have granted his motion to suppress because the use of the drug-detecting dog to sniff his BMW while it was parked in the carport constituted an unlawful search under the Fourth Amendment. This argument hinges on one issue: whether the carport where the vehicle was parked constitutes the curtilage of the apartment.

As relevant here, the Fourth Amendment protects the people from "unreasonable searches" of "their . . . houses." And, as a general rule, the curtilage of a home is protected by the Fourth Amendment. *See United States v. Dunn*, 480 U.S. 294, 300 (1987); *see also Jardines*, 569 U.S. at 6 (noting that the area "immediately surrounding and associated with the home" is "part of the home itself for Fourth Amendment purposes" (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984))). That rule is well-rooted in history. "At the founding, curtilage was considered part of the 'hous[e]' itself." *Collins v. Virginia*, 138 S. Ct. 1663, 1676 (2018) (Thomas, J., concurring) (alteration in original) (quoting 4 W. Blackstone, Commentaries on the Laws of England 225 (1769) ("[T]he capital house protects and privileges all its branches and appurtenants, if within the curtilage.")). "The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both

physically and psychologically, where privacy expectations are most heightened." *Id.* at 1670 (majority opinion) (quoting *Ciraolo*, 476 U.S. at 212–213).

Although it is well-settled that the warrantless search of a home's curtilage with a drug-sniffing dog violates the Fourth Amendment, *Jardines*, 569 U.S. at 11–12, what constitutes curtilage for purposes of the Fourth Amendment generally, and in the present case in particular, are harder questions. If the carport was within the curtilage of May-Shaw's apartment, then the dog sniff constituted an unconstitutional warrantless search under *Jardines*, but if the carport was not within the curtilage, then the sniff was not a search, and therefore was not constitutionally problematic. *See United States v. Perez*, 440 F.3d 363, 375 (6th Cir. 2006) (holding that using a drug-sniffing dog on a car parked in a hotel parking lot, which was not stopped, detained, or moved, did not constitute a search).

Courts have identified four factors as guideposts to determining whether an area falls within a home's curtilage: (1) the proximity of the area to the home, (2) whether the area is within an enclosure around the home, (3) how that area is used, and (4) what the owner has done to protect the area from observation from passersby. *Morgan*, 903 F.3d at 561 (citing *Dunn*, 480 U.S. at 301). These factors are not to be applied mechanically; rather, they are "useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Dunn*, 480 U.S. at 301. In the application of the factors, the onus is on May-Shaw: he "bears the burden of establishing that the challenged search violated his Fourth Amendment rights." *United States v. Coleman*, 923 F.3d 450, 455 (6th Cir. 2019) (quoting *United States v. Witherspoon*, 467 F. App'x 486, 490 (6th Cir. 2012)).

The Supreme Court recently held that an enclosed driveway abutting a house constituted the curtilage of the home. *Collins*, 138 S. Ct. at 1670–71. In *Collins*, police searched a motorcycle that was covered by a tarp and was parked in a section of a driveway that was partitioned off by two brick walls and a wall of the house itself. *Id.* at 1670. "A visitor endeavoring to reach the front door of the house would have to walk partway up the driveway, but would turn off before entering the enclosure and instead proceed up a set of steps leading to

the front porch." *Id*. at 1671.  The Court held that the driveway enclosure "constitute[d] 'an area adjacent to the home and "to which the activity of home life extends,"' and so is properly considered curtilage." *Id*. (quoting *Jardines*, 569 U.S. at 7).

May-Shaw argues that *Collins* is dispositive here, and that because the carport was partially enclosed, it constitutes the curtilage of the apartment.  But *Collins* does not mandate that result.  At least three cases in this circuit cut against May-Shaw's position.

First, there is *Coleman*, mentioned above.  There, we found that the defendant's car was not within the curtilage of his condo when it was parked in his condominium complex's driveway, reasoning in part that the driveway was communal and other condo residents frequently walked past cars parked in front of the condo units.  923 F.3d at 456–57; *see also United States v. Jones*, 893 F.3d 66, 72 (2d Cir. 2018) ("[*Collins*] has no effect on [the defendant's] appeal, which fails because the driveway in which [the defendant's] vehicle was parked was the *shared* driveway of tenants in two multi-family buildings and was not within the curtilage of [his] private home.").

In addition, two Sixth Circuit cases decided prior to *Collins*—*United States v. Galaviz*, 645 F.3d 347 (6th Cir. 2011), and *United States v. Estes*, 343 F. App'x 97 (6th Cir. 2009)—are instructive.  Those cases involved unenclosed driveways that were adjacent to a home, and abutted a sidewalk or alley, with no steps taken by the resident to obstruct the view of passersby. *Galaviz*, 645 F.3d at 356; *Estes*, 343 F. App'x at 101.  In both cases, we held that officers did not intrude upon the curtilage by entering the driveway.  In *Galaviz* we found that although the driveway was adjacent to the house, it was not enclosed by any barrier, and the portion where cars were parked was directly adjacent to a public sidewalk.  *Galaviz*, 645 F.3d at 356.  And in *Estes*, the driveway was not curtilage because it was not enclosed, the defendant had not taken any steps to protect it from observation by passersby, and it was used as a point of entry to the defendant's residence.  *Estes*, 343 F. App'x at 101.

May-Shaw directs the court's attention to several cases—one from the Sixth Circuit, and three from district courts within our circuit—in an attempt to establish a broad rule that a carport is always within the curtilage of a home.  *See* Appellant Br. at 26.  But each of the cases he cites

is factually distinct. As the first case he cites for that proposition states, "[e]very curtilage determination is distinctive and stands or falls on its own unique set of facts." *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 598 (6th Cir. 1998) (alteration in original) (quoting *United States v. Reilly*, 76 F.3d 1271, 1276 (2d Cir. 1996))).

In *Daughenbaugh*, as May-Shaw notes, our court held that a detached garage was within the curtilage of a home. *Id*. at 601. But there, the garage was "within natural boundaries demarcated by the river and the heavy tree coverage . . . [and] the backyard and garage [were] not readily visible from the street." *Id*. at 599. We considered these natural boundaries to be compelling evidence that the garage was within the curtilage of the home. *Id*. Furthermore, the garage was set far back from the road, and a large tree prevented neighbors, those parked in the driveway, and those on the street from viewing the interior of the garage. *Id*. at 600. Important to the court's calculus was that the "contents [of the garage] were only visible after a person entered the backyard and approached the garage." *Id*.

Here, although the carport where May-Shaw parked his vehicles was the closest in proximity to his apartment, it was not as close to the residence as other structures found to be curtilage have been. But in any event, that factor is not determinative "without reference to the additional *Dunn* factors." *Daughenbaugh*, 150 F.3d at 599. In *Collins*, *Coleman*, *Galaviz*, and *Estes*, the areas at issue were all driveways that, unlike the carport here, directly abutted homes or condominiums. And even in those cases where the driveway was connected to the home, the courts each held that the driveway was not curtilage.

The second factor—whether the area is an enclosure around the home—also cuts against May-Shaw. Here, although the area was enclosed, at least to the extent that the carport had a roof and two side walls, it was not in an enclosure around the residence as was the walled-off driveway in *Collins*, nor was it enclosed within natural boundaries of the property like the detached garage in *Daughenbaugh*.

The third factor, which relates to May-Shaw's use of the carport, arguably weighs in his favor because, by regularly parking his car in the carport, he contends it was sufficiently "associated with the activities and privacies of domestic life" to ostensibly support a finding that

it was within the curtilage of his apartment.  *Dunn*, 480 U.S. at 303.  However, there is no evidence that May-Shaw had any legal right to exclude others from the carport.

Furthermore, May-Shaw did little to protect the area from the view of passersby, and so the fourth factor weighs against him.  With respect to this last consideration, May-Shaw's case falls somewhere in between *Collins* and *Coleman*.  Like the driveway in *Collins*, the carport here was partially enclosed, which cuts at least somewhat in his favor.  But, like in *Coleman*, May-Shaw took no additional steps to protect the area from passersby.  He did not, as did the petitioner in *Collins*, cover his vehicle to shield it from view from his neighbors.  *See* 138 S. Ct. at 1668.  And because officers could see into the carport from a camera affixed to a utility pole across a street, it is apparent that May-Shaw did not take significant steps to protect the area from observation.

The burden is on May-Shaw to establish that the carport is "intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened." *Collins*, 138 S. Ct. at 1670 (quoting *Ciraolo*, 476 U.S. at 212–13).  He has not done so.  May-Shaw has failed to establish that the carport constituted the curtilage of his apartment; the drug dog sniff therefore did not constitute a search.  *See Perez*, 440 F.3d at 375.  Because we hold that neither the pole-camera surveillance nor the dog sniff constituted a search, we need not decide whether the evidence would have been admissible under the independent-source doctrine or the good-faith exception.

## III.

May-Shaw has not shown that (1) police surveillance from the pole camera violated his reasonable expectation of privacy; or (2) the dog sniff constituted an unconstitutional search.  Therefore, we **AFFIRM** the district court's denial of his motion to suppress.