RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0225p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

No. 19-1500

RAHEIM ABDULLAH TRICE,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:18-cr-00192-1—Robert J. Jonker, District Judge.

Argued: May 8, 2020

Decided and Filed: July 21, 2020

Before: SUHRHEINRICH, BUSH, and MURPHY, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Kort W. Gatterdam, CARPENTER LIPPS & LELAND LLP, Columbus, Ohio, for
Appellant. Joel S. Fauson, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids,
Michigan, for Appellee. **ON BRIEF:** Kort W. Gatterdam, CARPENTER LIPPS & LELAND
LLP, Columbus, Ohio, for Appellant. Joel S. Fauson, UNITED STATES ATTORNEY'S
OFFICE, Grand Rapids, Michigan, for Appellee.

_____

## OPINION

_____

JOHN K. BUSH, Circuit Judge. Raheim Trice entered a conditional guilty plea to one
count of possession of methamphetamine with intent to distribute in violation of 21 U.S.C.
§ 841(a)(1), (b)(1)(A)(viii), (B)(iii), and (C). He conditioned his plea on this appeal challenging

the warrant issued to search his apartment. Law enforcement officers entered the common area of his apartment building and placed a camera disguised as a smoke detector on the wall across the hallway from the front door of his unit. The camera was equipped with a motion detector and set to activate whenever the door to his apartment opened. The camera made several videos of Trice entering and exiting, and this information was used in an affidavit in support of the search warrant. Law enforcement executed the warrant and seized drugs and other paraphernalia consistent with distribution. Trice contends that the use of the camera violated his Fourth Amendment rights.

We disagree because Trice's arguments are squarely foreclosed by two lines of authority from this court. The first makes clear that he had no reasonable expectation of privacy in the apartment's unlocked common hallway where the camera recorded the footage. The second teaches that law enforcement may use video to record what police could have seen from a publicly accessible location. Although the camera was placed inside an apartment building rather than on a utility pole (as is more typical), we are compelled by this authority to allow use of the video. The camera captured nothing beyond the fact of Trice's entry and exit into the apartment and did not provide law enforcement any information they could not have learned through ordinary visual surveillance. We **AFFIRM**.

## I.

As part of the investigation that led to Trice's arrest, Investigator Marcel Behnen and the Kalamazoo Valley Enforcement Team (KVET) executed three controlled buys using a confidential informant (CI). The first controlled buy occurred on July 10, 2018 in the parking lot of a liquor store. Trice arrived at the lot as a passenger in a black Pontiac Grand Prix driven by a female. The Pontiac was registered in the name of Cradonda Dominique Trice,[1] 114 Espanola

---

[1]We will refer to the defendant as "Trice" and Cradonda Dominque Trice as "Cradonda Trice" throughout the remainder of this opinion.

Avenue, Apartment B5 in Parchment, Michigan.**2** Trice and the CI completed the buy, and Trice returned to the Pontiac. Officers confirmed that the purchased substance was heroin.

The second controlled buy occurred on July 19, 2018, in the parking lot of a Sam's Party Store located near an apartment building at the 114 Espanola address where the Pontiac was registered. Trice arrived on foot. Officers observed him exit the rear door of the apartment building and walk to the store lot, where he completed the drug deal. Trice then walked back to the apartment building.

Based on the car registration, Investigator Behnen suspected that Trice was associated with Apartment B5 in the apartment building. Behnen conducted a search of police records to corroborate his suspicion, and he identified a June 2017 police report responding to a complaint made by a Cradonda McFerrin, a name that officers knew to be an alias for Cradonda Trice. The report indicated that officers had spoken to the resident of Apartment B6 in the same building, who indicated that Cradonda Trice's apartment (B5) was located directly across the hallway.

The third controlled buy occurred on July 23, 2018. Before conducting this buy, Behnen visited the apartment building to confirm that Trice lived in, or made use of, Unit B5. This apartment is one of two units in the basement of the two-story building. Behnen entered through the building's front door, which was ajar and had no lock, intercom, or doorbell. He went to the basement floor and identified two apartments, one of which had "B6" on its door. The door opposite Apartment B6 was unmarked.

Behnen deduced that the unmarked door was the front entryway of Apartment B5, and Trice does not dispute that the unmarked door was to that unit. Police installed a motion-sensor camera disguised as a smoke detector on the hallway wall opposite the unmarked door. The hidden camera's location on the wall was between the door to Apartment B6 and the door to a common storage closet. The camera was set to record for a period of two to three minutes when anyone entered or exited Apartment B5.

---

**2**Trice is not listed as a resident of the apartment, but he refers to it as his apartment in his briefs. We refer to it as Trice's apartment for the sake of simplicity, but our analysis would be the same whether he lived in the apartment or merely was associated with and made some use of the unit.

After the camera was installed, KVET and the CI executed the final controlled buy, again in the parking lot of Sam's Party Store. Investigators watched Trice exit the apartment building, walk to the designated location, complete the purchase, and return to the building. Trice entered and exited the building using the rear door, which accesses the basement.

After the buy was completed, Investigator Behnen returned to the apartment building and retrieved the camera. It had been in place for approximately four to six hours and had video-recorded Trice's entering and exiting Apartment B5 on three or four occasions. One video shows Trice using his cell phone for several minutes, but the display on the cell-phone screen is not visible in the footage. Also, although the video records a view through the threshold of the apartment doorway when the apartment's door is open, nothing inside the apartment is visible.

The video supported the affidavit that Behnen submitted in his application for a search warrant for Apartment B5. The affidavit described the previous controlled buys and explained that Trice had exited and entered the apartment building to execute the second buy. It further stated that the Pontiac driven to the first buy, and in which Trice was a passenger, was registered to Cradonda Trice at that address. The affidavit also relied upon a June 2017 police report, made in response to a call from Cradonda Trice, in which the occupant of Apartment B6 indicated that she was in the apartment directly across the hall. Finally, the affidavit stated that Behnen had "conducted surveillance of 114 Espanola Apt B5 on this day and observed Trice entering and exiting Apt B5 on several occasions." R. 56-1 at PageID 463 ¶ G(i).

After the search warrant issued, officers executed a search of Apartment B5 on July 25, 2018. Police seized 64 grams of methamphetamine, 43 grams of crack cocaine, 28 grams of powder cocaine, three grams of heroin, digital scales, and packaging material.

Trice was indicted on four counts: three counts of distribution of heroin in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C) (Counts I–III); and one count of possession of methamphetamine with intent to distribute in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii), (b)(1)(B)(iii), and (b)(1)(C) (Count IV). He moved to suppress evidence seized in the apartment search, arguing that the use of the hidden camera was unconstitutional. The district court held an

evidentiary hearing and heard testimony from Investigator Behnen and Joe Lukeman, the property manager of the apartment building.

Lukeman testified about the layout of the property and explained that the exterior doors do not have locks and are sometimes ajar, that the building does not have an intercom or doorbells, and that there are no fences preventing entry. He also explained that the basement hallway outside of Apartment B5 can be accessed from the upstairs apartments to reach the laundry room, which was also in the basement. The basement hallway is relatively small, and Lukeman estimated that the distance between Apartment B5 and B6 is ten or slightly under ten feet from door to door. He testified that the only people allowed in the hallways are tenants and invited guests, and explained that he would expect the apartment staff or a tenant to call the police if someone was loitering in the building for several hours uninvited. He indicated that if tenants saw something that gave them concern or someone loitering in a common area, they would typically call management who would in turn direct them to call the police.

Investigator Behnen testified about the controlled buys and his placement of the hidden camera in the building. The facts concerning the controlled buys and the hidden camera are set forth above. Trice did not put on any evidence.

After the district court denied the motion to suppress, Trice entered a conditional guilty plea as to Count IV, pursuant to a plea agreement in which the Government agreed to drop the remaining counts and Trice retained his right to appeal the denial of the suppression motion. The district court imposed a sentence of 192 months to be followed by five years of supervised release. This appeal followed.

## II.

When reviewing a district court's decision on a motion to suppress, we use a mixed standard of review, reviewing findings of fact for clear error and conclusions of law de novo. *United States v. Hines*, 885 F.3d 919, 924 (6th Cir. 2018). Evidence should be viewed in the light most favorable to the district court's conclusions. *United States v. McCraney*, 674 F.3d 614, 616–17 (6th Cir. 2012). "[A] denial of a motion to suppress will be affirmed on appeal if the district court's conclusion can be justified for any reason." *United States v. Moorehead*,

912 F.3d 963, 966 (6th Cir. 2019) (alteration in original) (quoting *United States v. Pasquarille*, 20 F.3d 682, 685 (6th Cir. 1994)).

Trice argues that that the district court erred in denying his motion to suppress because the use of the disguised camera violated his Fourth Amendment rights. Without the tainted evidence obtained by use of the camera, he contends, the affidavit would not be sufficient to support the warrant. Trice further maintains that the good-faith exception does not apply because Investigator Behnen purposefully misled the magistrate to obtain the warrant.

"It is well settled under the Fourth Amendment that a warrantless search is *per se* unreasonable subject only to a few specifically established and well-delineated exceptions." *Morgan v. Fairfield Cty.*, 903 F.3d 553, 560–61 (6th Cir. 2018) (cleaned up) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). "Under Fourth Amendment jurisprudence, there are two ways in which government action may constitute a search." *United States v. May-Shaw*, 955 F.3d 563, 567 (6th Cir. 2020). First, "when the government gains information by physically intruding into a constitutionally protected area—namely, 'persons, houses, papers, and effects,' U.S. Const. amend. IV—'a search within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'" *Id.* (quoting *Morgan*, 903 F.3d at 561 (in turn quoting *Florida v. Jardines*, 569 U.S. 1, 5 (2013))). Second, "a search occurs when 'a government official invades an area in which "a person has a constitutionally protected reasonable expectation of privacy."'" *Id.* (quoting *Taylor v. City of Saginaw*, 922 F.3d 328, 332 (6th Cir. 2019) (in turn quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring))).

Trice argues only that the use of the disguised camera violated his reasonable expectation of privacy; he does not raise any argument sounding in a property-based approach.[3]

---

[3]Because Trice did not raise a property-based Fourth Amendment argument, we express no views on the merits of such an argument.

### A.       Reasonable Expectations of Privacy in Apartment Common Areas

Under the *Katz* framework, "there are two requirements for a government intrusion to constitute a Fourth Amendment search: first, a person must exhibit 'an actual (subjective) expectation of privacy' in the place or thing searched; second, the expectation is one 'that society is prepared to recognize as 'reasonable.'" *May-Shaw*, 955 F.3d at 567 (quoting *Katz*, 389 U.S. at 361); *see also United States v. Warshak*, 631 F.3d 266, 284 (6th Cir. 2010) (explaining these "two discrete inquiries" under the reasonable-expectation-of-privacy framework).

As to the first, we find that Trice may have had a subjective expectation of privacy in the basement area and the area outside his doorway.  The area is an enclosed basement hallway near his apartment unit.  Moreover, as Investigator Behnen testified, Trice's casual behavior and use of his cell phone, as recorded by the camera, indicated that he did not believe he was being watched.

The question is therefore whether Trice's belief was objectively reasonable.  This court considers a number of factors to determine whether an expectation of privacy is objectively reasonable: "(1) whether the defendant was legitimately on the premises; (2) his proprietary or possessory interest in the place to be searched . . . ; (3) whether he had the right to exclude others from the place in question; and (4) whether he had taken normal precautions to maintain his privacy." *United States v. Dillard*, 438 F.3d 675, 682 (6th Cir. 2006) (citing *United States v. King*, 227 F.3d 732, 744 (6th Cir. 2000)).

Applying these factors, we have held that an apartment tenant has a reasonable expectation of privacy in the apartment building's locked common area.  *See United States v. Heath*, 259 F.3d 522, 534 (6th. Cir. 2001) ("The officers in the instant matter entered a locked building without utilizing the proper procedure and, therefore, the ensuing search was violative of defendants' subjective expectation of privacy."); *United States v. Carriger*, 541 F.2d 545, 552 (6th Cir. 1976) ("[W]hen, as here, an officer enters a locked building, without authority or invitation, the evidence gained as a result of his presence in the common area of the building must be suppressed.").  We have similarly held that a resident in a duplex had a reasonable expectation of privacy in a shared basement, even though it was unlocked, where the duplex

residents "lived there as one family" and treated the property as a single unit. *King*, 227 F.3d at 748.

However, we limited the scope of these holdings in *Dillard*, 438 F.3d 675. There, we held that the defendant "did not have a reasonable expectation of privacy in the common hallway and stairway of his duplex that were unlocked and open to the public." *Id.* at 682. We explained that even though the defendant had a possessory interest in the common area and the right generally to exclude non-tenants, he nonetheless lacked a reasonable expectation of privacy because he "made no effort to maintain his privacy in the common hallway." *Id.* The exterior doors were "not only unlocked but also ajar." *Id.* Further, the apartment building had no intercom system, nor any indication of a doorbell. *Id.* Thus, officers (or anyone else needing to speak to the defendant) had no way of alerting the defendant of their presence without entering the unlocked common area and approaching the tenant's individual interior door. *See id.* at 682–83.

## B.    Trice's Reasonable Expectation of Privacy in the Basement Hallway

The common hallway in *Dillard* is indistinguishable from the hallway at issue here. *See* 438 F.3d at 682–83. The entry door through which Investigator Behnen entered was unlocked and ajar. There was no intercom system, doorbell, or any other way to alert tenants about the presence of a visitor. As in *Dillard*, anyone who wanted to knock on a tenant's door would need to enter through the exterior door, walk through the common hallway, and locate the door of the individual unit. The hallway was effectively a common area, open to all, in which Trice had taken no steps to "maintain his privacy." *See id.* at 682 (quoting *King*, 227 F.3d at 744). He therefore did not have a reasonable expectation of privacy in the unlocked common hallway. *See id.*

Trice argues that *Dillard* is distinguishable because here, law enforcement entered into his curtilage to place the camera in the common hallway near his doorway.[4] We agree that

---

[4]At oral argument, Trice suggested that both the area around his door that was the subject of surveillance as well as the area in which the camera was placed both constitute curtilage. But as we discuss below, we have upheld the constitutionality of utility-pole cameras, even if the area being surveilled constitutes curtilage. *See, e.g., United*

placement of a camera within the curtilage of a home without a warrant would be presumptively unreasonable. For the purposes of the Fourth Amendment, "the area 'immediately surrounding and associated with the home'—what [the Supreme Court] call[s] the curtilage—[is regarded] as 'part of the home itself.'" *Jardines*, 569 U.S. at 6 (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)). "[W]hen it comes to the Fourth Amendment, the home is first among equals." *Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018) (alteration in original) (quoting *Jardines*, 569 U.S. at 6). Curtilage is the area that is "intimately linked to the home, both physically and psychologically, and is where privacy expectations are most heightened.'" *Jardines*, 569 U.S. at 6 (internal quotations omitted) (quoting *California v. Ciraolo*, 476 U.S. 207, 213 (1986)). It is "the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life.'" *Ciraolo*, 476 U.S. at 212 (quoting *Oliver*, 466 U.S. at 180).

Conducting a warrantless investigation by placing a camera in this constitutionally protected area would therefore be unlawful, either because it worked a physical intrusion into the curtilage, *see Jardines*, 569 U.S. at 9–10; *Taylor*, 922 F.3d at 333; *accord United States v. Jones*, 565 U.S. 400, 404–05 (2012), or because it would violate the owner's reasonable expectation of privacy, *see Jardines*, 569 U.S. at 12–13 (Kagan, J., concurring). Yet, although we agree that Trice's constitutional rights would have been violated had the camera been placed in the curtilage of his home, we find the search was lawful because the area in which the camera was placed—the wall opposite his apartment door—does not constitute curtilage.

Courts have identified four factors to determine whether an area falls within a home's curtilage: (1) the proximity of the area to the home, (2) whether the area is within an enclosure around the home, (3) how that area is used, and (4) what the owner has done to protect the area from observation from passersby. *Morgan*, 903 F.3d at 561 (citing *United States v. Dunn*, 480 U.S. 294, 301 (1987)). "These factors are not to be applied mechanically; rather, they are 'useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that

---

*States v. Houston*, 813 F.3d 282, 288 (6th Cir. 2016). Thus, we address only whether the area in which the camera was placed constitutes curtilage.

it should be placed under the home's "umbrella" of Fourth Amendment protection.'" *May-Shaw*, 955 F.3d at 569–70 (quoting *Dunn*, 480 U.S. at 301).

The first factor weighs in favor of Trice. The camera was placed in close proximity to his home, on the wall opposing his unit in between the door to his neighbor's apartment and the door to a storage closet. Investigator Behnen estimated that the distance was "about ten or slightly under ten feet from door to door." R. 49 at PageID 263–64. This distance is within the range that we have held falls within Fourth Amendment protections. *See Morgan*, 903 F.3d at 561 (area five to seven feet from home constitutes curtilage); *see also Brennan v. Dawson*, 752 F. App'x 276, 282 (6th Cir. 2018) (same for area arm's length from home); *Widgren v. Maple Grove Twp.*, 429 F.3d 575, 582 (6th Cir. 2005) (same for area four to six feet from home).

However, the other three factors weigh strongly against him. The area was not in an enclosure around the home, but instead in a common unlocked hallway. Similarly, Trice did not take any measures to protect the area from observation. Most important for this case, though, is how the area is used. *See United States v. Jackson*, 728 F.3d 367, 374 (4th Cir. 2013) (finding the third *Dunn* factor the "most telling" in holding that an outdoor common area did not constitute curtilage of an apartment). Simply put, there is nothing about the hallway wall to suggest that it was "an area adjacent to the home and 'to which the activity of home life extends.'" *Collins*, 138 S. Ct. at 1671 (quoting *Jardines*, 569 U.S. at 7). The hallway in question was a common area open to the public to be used by other apartment tenants to reach their respective units. The exterior doors did not have locks and were at least sometimes ajar, so the hallway was accessible to any passersby. It was also used by other tenants as a passageway to the basement laundry unit.

Further, the camera was placed on a wall opposite Trice's door, an area over which Trice does not claim to have any authority. Indeed, from the testimony introduced at the suppression hearing, it appears that the camera was placed closer to his neighbor's door than his own. *See* R. 49 at PageID 262 ¶¶ 19–21 (explaining that area in which camera was located was next to the door of "unit number 6"). There is little doubt that the apartment manager would have been free to post flyers or signs, and seemingly did post at least a sign on the door on the other side of the camera indicating that tenants could not store their personal belongings in the storage closet. *See*

*id.* at ¶¶ 15–18. So too would the landlord have been able to put a camera in the hallway if he had so chosen.

We therefore conclude that the camera was not placed within the curtilage of Trice's apartment. This is consistent with our previous cases holding that readily visible common areas do not constitute curtilage of an apartment. *See May-Shaw*, 955 F.3d at 571 (holding that a carport located in an apartment complex's common parking lot was not curtilage); *United States v. Coleman*, 923 F.3d 450, 456–57 (6th Cir. 2019) (citing *United States v. Jones*, 893 F.3d 66, 72 (2d Cir. 2018) (holding that shared driveway was not curtilage)); *United States v. Galaviz*, 645 F.3d 347, 356 (6th Cir. 2011) (similar); *see also United States v. Makell*, 721 F. App'x 307, 308 (4th Cir. 2018) ("[W]e find that the common hallway of the apartment building, including the area in front of [the defendant's] door, was not within the curtilage of his apartment."); *Jackson*, 728 F.3d at 374 (area not curtilage because it "was a common area used by all residents in the apartment complex").

Accordingly, we find that the camera was not placed in a constitutionally protected area.

**C.      Use of the Camera**

Trice argues that even if law enforcement were permitted to conduct an investigation in the common hallway, it was not entitled to do so using a hidden camera. He argues that even if the hallway itself is not a constitutionally protected area, the use of a camera represented such a significant degree of intrusion that it violated his reasonable expectation of privacy. And, he notes that *Dillard* did not pertain to use of a hidden camera.

True enough, *Dillard* involved law enforcement's physical entry into the unlocked common area of the duplex after which the officers obtained consent to search the defendant's unit. *See* 438 F.3d at 677–79. Accordingly, although it is clear that law enforcement could have physically entered the basement hallway and observed Trice enter and exit his apartment, *Dillard* does not address whether law enforcement could obtain the same information through use of a video camera. However, we have upheld the use of cameras by law enforcement to record on video what it could have observed through ordinary surveillance. *See May-Shaw*, 955 F.3d at

565; *United States v. Houston*, 813 F.3d 282, 288 (6th Cir. 2016). For the reasons that follow, we find *Houston* and its progeny sufficient to uphold the use of the camera here.

"[T]he Fourth Amendment does not 'preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible.'" *Houston*, 813 F.3d at 288 (quoting *Ciraolo*, 476 U.S. at 213). This is because there is "no reasonable expectation of privacy in what [one] 'knowingly exposes to the public.'" *Id.* (quoting *Katz*, 389 U.S. at 351). Accordingly, the Supreme Court in *Ciraolo* held that law enforcement did not violate the defendant's reasonable expectation of privacy by flying a plane over his home and viewing illegal activity that was visible from that vantage point, even though it was within the curtilage of the home and was not visible from the street. *See* 476 U.S. at 215. The Court explained that it was "unreasonable for respondent to expect that his marijuana plants were constitutionally protected from being observed with the naked eye from an altitude of 1,000 feet." *Id.*

Applying this principle, we held in *Houston* that law enforcement did not violate a homeowner's reasonable expectation of privacy by recording video footage from a utility pole. *See* 813 F.3d at 288. This was so, even though the camera recorded activities that occurred within the curtilage of the home, because the pole camera "captured the same views enjoyed by passersby on public roads," and agents therefore "only observed what Houston made public to any person traveling on the roads surrounding the farm." *Id.*; *see also May-Shaw*, 955 F.3d at 566 (upholding use of pole camera because "the area surveilled by the pole camera was readily accessible from a public vantage point"); *United States v. Powell*, 847 F.3d 760, 773 (6th Cir. 2017) (upholding pole camera that took photographs observing a driveway that was "open and accessible to public view"). We further explained that the Fourth Amendment was not violated simply because law enforcement used a camera rather than conducting ordinary visual surveillance because "[t]he law does not keep [law enforcement] from more efficiently conducting surveillance . . . with the technological aid of a camera." *Houston*, 813 F.3d at 289 (citing *United States v. Knotts*, 460 U.S. 276, 282 (1983)).

Trice argues that *Houston* is inapplicable because the hallway in which the camera was placed was not a "truly public space." Appellant's Br. at 24. He argues that although it may be

permissible to post a camera on a utility pole, it is different to "trespass in an apartment building" and place a camera in Trice's hallway. *Id.*

Although we recognize that the camera at issue here implicates different concerns than a camera placed upon a utility pole, we find Trice's argument unconvincing. To be sure, the pole camera cases—and the authorities upon which they rely—emphasize that the camera was capturing what was visible from a "public vantage point." *Houston*, 813 F.3d at 288 (quoting *Ciraolo*, 476 U.S. at 213). But that part of the analysis concerned the subject of the surveillance, not the means of surveillance. For example, the subject of the surveillance in *Ciraolo* was a marijuana garden that was located in the curtilage of the home and hidden from street view behind a large fence. *See* 476 U.S. at 209–10. Yet the Court held that the Fourth Amendment was not violated when law enforcement viewed that garden from an airplane because it could be seen by "[a]ny member of the public flying in this airspace." *Id.* at 213. Similarly, the point was made in *Houston* in response to an argument that the camera captured images of the defendant standing near his trailer, in an area that could be considered curtilage. *See* 813 F.3d at 288. Yet we rejected the argument because the area, even if curtilage, was readily visible from the public street. *See id.* at 288–89.

Here, there is no question that the subject of surveillance—Trice's apartment door—was readily visible from the unlocked hallway in which he had no reasonable expectation of privacy. *See Dillard*, 438 F.3d at 677–79. There is accordingly no question that law enforcement could have observed his entry and exit into the apartment from the unlocked common hallway, regardless of whether it was truly public.

As to the means of surveillance, *Houston* acknowledged that the pole camera was useful because police vehicles "stuck out like a sore thumb at the property." 813 F.3d at 289 (cleaned up). But as the court explained, law enforcement "theoretically could have staffed an agent disguised as a construction worker to sit atop the pole." *Id.* That was not necessary because "law enforcement may use technology to 'augment [] the sensory faculties bestowed upon them at birth' without violating the Fourth Amendment." *Id.* (alteration in original) (quoting *Knotts*, 460 U.S. at 282). "[I]t is only the possibility that a member of the public may observe activity

from a public vantage point—not the actual practicability of law enforcement's doing so without technology—that is relevant for Fourth Amendment purposes." *Id.*

The *Houston* panel relied on *Knotts*, in which the Supreme Court upheld the use of a GPS tracker affixed to a bottle of chloroform to track the defendant as he traveled on public roads. *See* 460 U.S. at 280. The *Knotts* Court explained that such GPS tracking did not violate the defendant's reasonable expectation of privacy because "[v]isual surveillance from public places along [the driven] route . . . would have sufficed to reveal all of the[] facts [gleaned from the investigation] to the police." *Id.* at 281.[5] In limiting its holding, the Court explained that if technology were to develop to allow "dragnet type law enforcement practices," the Court could determine "whether different constitutional principles may be applicable." *Id.* at 284.

The Court addressed that outer limit in *Carpenter v. United States*, 138 S. Ct. 2206 (2018). There the Court held that the Government invaded the defendant's reasonable expectation of privacy by accessing 127 days of historical cell-site location information ("CSLI") that provided a "detailed, encyclopedic, and effortlessly compiled" record of his location. *See id.* at 2216–17. Such information gathering ran afoul of the concerns raised in Justice Alito's and Justice Sotomayor's twin concurrences in *Jones*, 565 U.S. 400. First, collection of this data violated "society's expectation . . . that law enforcement agents and others would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single movement of an individual[] . . . for a very long period." *Carpenter*, 138 S. Ct. at 2217 (quoting *Jones*, 565 U.S. at 430 (Alito, J., concurring)). Second, these detailed records provided "an intimate window into a person's life, revealing not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations.'" *Id.* (quoting *Jones*, 565 U.S. at 415 (Sotomayor, J., concurring)).

These concerns, paired with the "retrospective quality of the data" that gave law enforcement access to information that was "otherwise unknowable," rendered use of the data

---

[5]*Houston* also relied on similar reasoning from this court's case in *United States v. Skinner*, 690 F.3d 772, 779 (6th Cir. 2012), which upheld the use of real-time cell-site location information to track the defendant on public roads for a period of three days. *Carpenter v. United States*, 138 S. Ct. 2206, 2217 n.3 (2018) left open the question of this type of cell-site location information, and we need not address it here.

unconstitutional. *Id.* at 2218–19. However, the Court left undisturbed its holding in *Knotts*, both because of the "rudimentary tracking" at issue and also the "'limited use which the government made of the signals from [the GPS tracker]' during a discrete 'automotive journey.'" *Carpenter*, 138 S. Ct. at 2215 (quoting *Knotts*, 460 U.S. at 284, 285).

Trice argues that the use of the camera runs afoul of *Carpenter* because he did not assume the risk that the Government would hide a camera outside his door, and further because the recordings "gave the Government the ability to travel back in time to retrace [his] whereabouts." Appellant's Br. at 24. We find this argument unconvincing.

First, Investigator Behnen used the camera for a singular and narrow purpose: to confirm his suspicion that Trice was associated with Apartment B5 rather than another unit. *See Knotts*, 460 U.S. at 284, 285 (upholding GPS because of the "limited use which the government made of the signals"). The camera therefore did not provide the type of comprehensive monitoring at issue in *Carpenter*.

Second, to gather this information, investigators needed only to walk into the hallway and visually observe Trice enter or exit the unit on the way to the controlled buy. *See Knotts*, 460 U.S. at 281 (emphasizing that use of the beeper "amounted principally to the following of an automobile of public streets and highways"); *Houston*, 813 F.3d at 289 (explaining that law enforcement could have obtained the same information by visual observation). They could have done this observation by posing as one of the many individuals that Trice could reasonably have expected in the hallway, be it "maintenance staff," "mail service," "garbage service," an invited guest of a tenant, or another tenant using the shared laundry room. *See* R. 49 at PageID 266 ¶¶ 6–9, 268 ¶ 1. Even if this was not practicable (although it seems it would have been), it was certainly possible. *See May-Shaw*, 955 F.3d at 568 (citing *Houston*, 813 F.3d at 289–90). The camera was therefore not a form of technology that provided law enforcement with information that was "otherwise unknowable," *Carpenter*, 138 S. Ct. at 2218, or could not have been otherwise obtained without conducting a search within the house, *see Jardines*, 569 U.S. at 11–

12 (drug-sniffing dog); *id.* at 12–14 (Kagan, J., concurring); *Kyllo v. United States*, 533 U.S. 27, 40 (2001) (thermal-image device).[6]

Third, the camera was activated by a motion sensor to record only in short increments and only when the front door to Apartment B5 was opened. All told, this produced three or four separate video clips, each of which lasted two to three minutes. Their length was much shorter than that of the pole-camera footage that we have allowed. *See May-Shaw*, 955 F.3d at 565 (twenty-three days); *Powell*, 847 F.3d at 773 (ninety days); *Houston*, 813 F.3d at 285 (ten weeks). The video hardly approached the type of "prolonged . . . monitoring" that Justice Alito suggested could give rise to a constitutional violation in his concurrence in *Jones*, 565 U.S. at 431 (Alito, J., concurring). And the information obtained—the simple entry and exit from his apartment—revealed nothing about Trice's "familial, political, professional, religions, [or] sexual associations," areas of concern for Justice Sotomayor. *See id.* at 415 (Sotomayor, J., concurring); *see May-Shaw*, 955 F.3d at 568–69 (holding that surveillance images that only captured the defendant's comings and goings from his apartment did not raise this type of Fourth Amendment concern).[7]

Finally, and importantly, we note the area where the surveillance occurred—a common hallway through which other tenants needed to walk to reach the common laundry room and in which Trice had no reasonable expectation of privacy. The door to the building was unlocked, and there was no intercom or internal buzzer system. Tenants would therefore expect that any member of the public was free to enter the building to knock on the door of individual units. *See Dillard*, 438 F.3d at 682–83.

---

[6]We note that the Seventh Circuit has held that the use of a drug-sniffing dog in a common area violates an apartment-dweller's reasonable expectation of privacy. *See United States v. Whitaker*, 820 F.3d 849, 850–51 (7th Cir. 2016). Although Trice cites this case for support, we need not adopt or reject the Seventh Circuit's holding because the camera at issue here, unlike a canine that has been specially trained to sniff drugs, is not a "sophisticated sensing device not available to the general public" providing access to information "that otherwise would have been unknowable without entering the apartment." *Id.* at 853.

[7]Trice argues that law enforcement violated his reasonable expectation of privacy because the cameras were directed to "view activities . . . inside the apartment." Appellant's Br. at 24. But as the district court found, the inside of the apartment is not visible in the footage, and the only information gleaned from the recordings was his entry and exit from the unit.

Trice argues that law enforcement could not have remained in this common area for the length of time the hidden camera was installed—four to six hours—without alerting attention. Although Lukeman testified that tenants would be encouraged to call the police themselves if they saw an uninvited loiterer, it is not clear that under Michigan law Trice would have the right to exclude anyone from the hallway. Michigan courts have explained that "[t]he landlord grants to tenants rights of exclusive possession to designated portions of the property, but the landlord retains exclusive possession of the common areas." *Stanley v. Town Square Coop.*, 512 N.W.2d 51, 54 (Mich. Ct. App. 1993); *see People v. Lumpkins*, No. 321844, 2015 WL 4470153, at *3 (Mich. Ct. App. July 21, 2015) (holding that apartment tenant had only "a license to *use* the common areas," but "no possessory interest in the hallway"); *O'Sullivan v. Greens at Gateway Ass'n*, No. 290126, 2010 WL 3184374, at *5 (Mich. Ct. App. Aug. 12, 2010) (similar); *see also Greenpeace, Inc. v. Dow Chem. Co.*, 97 A.3d 1053, 1060–61 (D.C. 2014) (holding that tenant in office building cannot bring action for trespass in common area, relying on *Stanley*); *Aberdeen Apartments v. Cary Campbell Realty Alliance, Inc.*, 820 N.E.2d 158, 166 (Ind. Ct. App. 2005) (holding that landlord retains exclusive possession in common areas and can thus bring action for trespass). In any event, it matters not whether investigators would have faced practical difficulties in conducting an analogous visual investigation; all that matters is that it was possible. *See May-Shaw*, 955 F.3d at 568 (citing *Houston*, 813 F.3d at 289–90).

Again, we emphasize the limited scope of our holding. The only information gained was his entry and exit to and from his apartment. We think that there is no reasonable expectation of privacy in the activity of leaving from a constitutionally protected area (the home) to an area without constitutional protection. In doing so, one necessarily "assume[s] the risk," *Carpenter*, 138 S. Ct. at 2220 (citation omitted), of being seen by virtue of the fact that one is going to a place where one must reasonably expect others may be. This is true for someone leaving a single-family home as well as someone exiting an apartment.[8]

---

[8]Trice argues that upholding the use of the camera in this situation will create an income-based disparity between the scope of Fourth Amendment protections, affording greater protections to those who live in homes than those who live in apartments. Although we are sympathetic to these concerns, they do not apply here. We are simply applying the same rule to Trice's apartment that would obtain for a single-unit house under *Houston*. *See* 813 F.3d at 288. Therefore, rather than parity, Trice actually argues for a more favorable rule than would apply in the single-unit context. To the extent he argues that this disparity arises because law enforcement would not be able

Accordingly, the use of the camera did not violate Trice's reasonable expectation of privacy.

\* \* \*

Because we find that the use of the camera did not constitute a search within the meaning of the Fourth Amendment, we do not address the Government's alternative arguments.

## III.

For all these reasons, we **AFFIRM** the district court's judgment.

---

to place a camera on the front porch of a single-unit home, we disagree because the wall in a common apartment hallway is simply not analogous to a front porch, as we have explained above.  To be sure, we do draw a distinction between multi-unit dwellings with locked doors and those with doors that are unlocked and ajar, but that distinction comes not from this case, but from *Dillard*.  *See* 438 F.3d 682.