NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0077n.06

No. 21-5297

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
|  | ) | Feb 18, 2022 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
|  | ) |  |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE |
|  | ) |  |
| ALEX JACKSON, | ) |  |
|  | ) | OPINION |
| Defendant-Appellant. | ) |  |
|  | ) |  |

Before: CLAY, GRIFFIN, and STRANCH, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** A jury convicted Alex Jackson of being a felon in possession of a firearm. Jackson appeals the sufficiency of the evidence to support his conviction of firearm possession and the district court's denial of his motion to suppress evidence recovered from a *Terry* stop. We **AFFIRM** the district court on both issues.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On October 23, 2019, Jackson, and his co-defendant Corey Webster, were indicted for being felons in possession of a firearm in violation of 19 U.S.C. §§ 922(g) and 924. Jackson moved to suppress the evidence obtained by law enforcement when the Jeep Patriot that he was driving and in which Webster was riding was stopped. The district court denied the motion on the record after an evidentiary hearing. The court then held a two-day trial. After the jury found Jackson guilty, the court sentenced Jackson to 30 months of imprisonment. Jackson timely

appealed. Because the pretrial suppression hearing evidence is separate from the evidence presented to the jury at trial, we examine the evidence presented at each stage separately.

### A. Suppression Hearing Evidence

At the hearing, Government witness Sergeant Jonathan Aydelott (the officer who conducted the stop), and a witness for the defense (an investigator with the Federal Public Defender's Office) testified to the following. On June 15, 2019, the Keg County Cowboys, a motorcycle group, held a poker run for charity that included several stops along the run at which volunteers worked. Lesa Lane, an employee at the Tennessee Department of Transportation (TDOT) who Aydelott had known for several years through his work as a police officer, was working at the Duck River Market stop. The Duck River Market "stays fairly busy" and is in a rural area. Sergeant Aydelott, an employee of the Hickman County Sheriff's Office who was working as a road deputy that day, received a phone call from Bobby Dunn, a reserve deputy with the Sheriff's Office. A reserve deputy is an individual "who would come in and ride with patrol officers" but did not answer calls alone. Aydelott testified that Dunn told him Lane called from the market to report "a suspicious vehicle in the area that had been around for approximately 45 minutes to an hour," and that Aydelott advised Dunn that Lane needed to call the central dispatch.

Aydelott testified that his police report reflects what Dunn told him at the time, and that he wrote the police report the next day after he spoke with Lane. The police report says, "Dunn stated, Lane called him and told him she was at the Duck River Market in Shady Grove when she observed a white male and a [B]lack male in a white Jeep continuously drive around in the area of the market," but does not specify an amount of time. It further says, "Lane then informed Dunn she observed the [B]lack male passenger remove a long barrel gun from the back seat into the front passenger seat."

Aydelott was driving toward Duck River Market when dispatch radioed that "they received a complaint or a call about a suspicious vehicle in the area and a couple [of] subjects acting suspicious[ly]." Aydelott testified that dispatch told him there was a "white Jeep with a white driver and [B]lack male passenger circling around the business and going up and down the road with a rifle." Sergeant Aydelott's report says only that dispatch advised "they just received a call from Lane stating there was a white male driving a white Jeep with [B]lack male passenger in the area of the market and they had a rifle in the vehicle."[1] Based on what Dunn and dispatch told him, the Sergeant concluded that the individuals in the vehicle were about to rob the market.

When Aydelott arrived at the store approximately two minutes later, he saw the Jeep parked to the side of the building and observed a Black male get into the passenger door of a white Jeep with a white male driver. Aydelott stated that he made eye contact with the passenger as he was getting into the Jeep, but did not see a firearm at that time. The Jeep then drove off toward the highway, and Aydelott proceeded to follow the Jeep and turn on his flashing lights. He claims that the Jeep took off "at an elevated" speed, but that it was not "extremely fast." The Jeep did not stop immediately on the highway, but instead it drove a quarter of a mile, turned onto a dirt road, and eventually stopped, traveling about 10 to 12 miles per hour on the dirt road. Before the Jeep stopped, the passenger jumped out of the front passenger door. Aydelott estimates that the Jeep continued for about 20 to 25 feet before it stopped. He did not pursue the passenger.

When Aydelott approached the Jeep, he asked Jackson why he did not stop the vehicle as soon as the police lights were activated. Jackson responded that he did not see the lights until after he turned off the highway, and his passenger, Webster, told him to keep going because he had a gun.

---

[1] Aydelott admitted that he doesn't recall if he was told that the suspects had been circling the market for 45 minutes.

The court ruled on the motion to suppress from the bench. Although it was a "close case," the court held that Sergeant Aydelott had "reasonable suspicion that criminal activity was afoot under the totality of the circumstances."

## B.     Trial Evidence

The issue at trial was whether Jackson possessed the rifle, so the record was developed more than at the pretrial suppression hearing. It included that Lane works with TDOT, and she testified as follows. When she arrived at the Duck River Market that morning, there was a white Jeep parked to her left with a driver and passenger sitting in the front seats; the passenger got out of the car and approached her car door. Even though she refused to acknowledge him, he stood there for a minute and then walked into the store and came back out and sat in the Jeep. Lane then moved her car to another location. The Jeep later moved to an area near Lane's vehicle, and she saw the passenger physically bring a barreled gun from the back seat to the front seat. Lane said she never saw the driver of the Jeep holding the rifle, nor did she ever see the driver leave the Jeep. Lane went into the store to report the Jeep's activity and subsequently saw the Jeep several more times as it kept going around the store for 40 to 45 minutes. Lane called her friend Sherri Dunn and asked Sherry to tell her husband, Bobby Dunn, a reserve deputy, what she saw. Then, Lane called dispatch.

Although Lane does not remember speaking to Bobby Dunn (and thinks she did not speak to him), Sherry Dunn testified that when Lane called, she handed the phone to her husband. When Sherry and her husband pulled in the Duck River Market area, Sherry saw the Jeep sitting at the back of the parking lot with two males inside. She never saw the driver of the Jeep hold a rifle.

Sergeant Aydelott's testimony was largely the same as his testimony from the suppression hearing. After stopping the Jeep and placing handcuffs on Jackson, he did a protective sweep of the Jeep because the back windows were tinted. When he opened the back passenger door of the

Jeep, he immediately saw a loaded long-barreled rifle on the floorboard with the buttstock of the rifle on the passenger side floorboard and the barrel of the rifle behind the driver's seat. Aydelott did not have the rifle fingerprinted.

The Government introduced the following agreed stipulations into the record:

(1) On June 15th of 2019, defendant Alex Jackson was a convicted felon, having been convicted of a crime involving punishment greater than one year.
(2)  On June 15th of 2019, defendant Alex Jackson knew that he was a convicted felon and that he had been convicted of a crime involving punishment greater than one year.
(3) Government Exhibit 5, a Lee-Enfield bolt-action rifle, was manufactured outside of Tennessee and traveled in interstate commerce prior to June 15th of 2019.
(4) On June 15th of 2019, the white Jeep Patriot bearing Tennessee license plate 3B06R3 was registered to defendant Alex Jackson's wife, Tiffiney.

At the close of the Government's case-in-chief and without putting on any proof, Jackson moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29. Regarding jury instructions, over Jackson's objection, the court gave a flight instruction. It described how the jury was to consider the testimony at trial that Jackson fled law enforcement:

(1) You have heard testimony that after the crime was supposed to have been committed, the defendant may have fled from law enforcement.

(2) If you believe that the defendant fled from law enforcement, then you may consider this conduct, along with all the other evidence, in deciding whether the government has proved beyond a reasonable doubt that he committed the crime charged. This conduct may indicate that he thought he was guilty and was trying to avoid punishment. On the other hand, sometimes an innocent person may flee for some other reason. The defendant has no obligation to prove that he had an innocent reason for his conduct.

## II.   DISCUSSION

Jackson raises two issues on appeal:  (1) the district court erred in denying his motion to suppress the evidence obtained during the *Terry* stop, and (2) the district court erred in denying his Rule 29 motion on the possession of a firearm charge.

### A. Motion to Suppress

When a motion to suppress is denied, this court reviews the district court's factual findings for clear error and legal conclusions de novo. *United States v. Prigmore*, 15 F.4th 768, 777 (6th Cir. 2021). We review the evidence "in the light most favorable to the district court's conclusions," *United States v. Trice*, 966 F.3d 506, 512 (6th Cir. 2020), *cert. denied,* 141 S. Ct. 1395 (2021). "[A] denial of a motion to suppress will be affirmed on appeal if the district court's conclusion can be justified for any reason." *Id.* (alteration in original) (quoting *United States v. Moorehead*, 912 F.3d 963, 966 (6th Cir. 2019)).

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. The seizure of a person includes when law enforcement uses "physical force" or a "show of authority" that restrains that person's liberty. *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021) (quoting *Terry v. Ohio*, 392 U.S. 1, 19, n.16 (1968)). A seizure includes investigatory stops such as when law enforcement stops a vehicle. *United States v. Cortez*, 449 U.S. 411, 417 (1981). Law enforcement may engage in an investigatory stop "when the officer has a reasonable articulable suspicion that criminal activity is afoot." *United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008) (quoting *Illinois v. Wardlow*, 528 U.S 119, 123 (2000)); *Terry*, 392 U.S. at 30.

"Reasonable articulable suspicion" is a nebulous concept, but what is clear is that the "essence" of the analysis is that the totality of the circumstances must be taken into consideration. *Cortez*, 449 U.S. at 417. A hunch does not create reasonable suspicion, but the level of suspicion required is "'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 397 (2014) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

Here, the seizure occurred when Jackson stopped his vehicle. According to his police report, when Aydelott arrived at the market, he had two pieces of information from Lane, a known and reliable source. First, Dunn reported to him that Lane had observed the Jeep "continuously drive around in the area of the market" and saw the passenger "remove a long barrel gun from the back seat into the front passenger seat." Dispatch reported that "they just received a call from Lane stating there was a white male driving a white Jeep with a [B]lack male passenger in the area of the market and they had a rifle in the vehicle."

After he arrived at the market, Aydelott saw the passenger get into the parked vehicle with Jackson and drive off "at an elevated speed." He did not see a firearm at that time. The Jeep did not immediately stop when Aydelott followed the Jeep and activated his lights; it drove a quarter of a mile down a dirt road at speeds of 10 to 12 miles per hour. After the passenger jumped out of the Jeep, the Jeep continued for another 20 to 25 feet before it stopped.

We review the foregoing to determine whether the information was sufficient to furnish reasonable suspicion. First, a known tipster entitles the tips to more weight than an anonymous tipster. *See Navarette*, 572 U.S. at 397; *see also Robinson v. Howes*, 663 F.3d 819, 828 (6th Cir. 2011). Lane is not an anonymous caller; she is someone Aydelott had known for several years because of her role at TDOT and its intersection with his police work. Aydelott had worked with Lane on several road incidents, such as storm damage and highway cleanups in which TDOT was involved. Aydelott and Lane's relationship weighs in favor of her tip's reliability. Lane also personally observed the Jeep's activity that she reported both to a reserve officer and to dispatch. *See Navarette*, 572 U.S. at 399–400 (explaining that contemporaneous reporting by a 911 caller may be treated as reliable); *see also Robinson*, 663 F.3d at 829 (finding a 911 call that "was a contemporaneous eyewitness account" weighed in favor of the statement's reliability). Thus,

because Lane was a known and reliable source and personally observed and reported the Jeep's activity, the tip is entitled to more weight in the reasonable suspicion analysis.

Second, in determining whether reasonable suspicion exists, officers can "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *Cortez*, 449 U.S. at 418). The record shows that Aydelott started his career at the Sheriff's Office in May 2004, left in 2015 to work for a drug task force for four years, then returned to the Sheriff's Office in April 2019.

Aydelott noted that the driving behavior reported and the information about the weapon were "not something common you see . . . in the county," especially as it was not hunting season. Jackson argues that these are normal events occurring during the day at a rural market that "stays fairly busy." And though it is not illegal to have a gun in a car in Tennessee, Aydelott concluded based on his training and experience that under the totality of the circumstances—the tip from a known source, the repeated circling of the market, and the presence and movement of the rifle— potential criminal activity was indicated. *See Sokolow*, 490 U.S. at 9–10.

Additionally, evasive behavior is a relevant factor in the reasonable suspicion analysis. *See Wardlow*, 528 U.S. at 124; *see also United States v. Keith*, 559 F.3d 499, 504–05 (6th Cir. 2009) (explaining cases where evasion weighed in favor of reasonable suspicion); *see also United States v. McCauley*, 548 F.3d 440, 445 (6th Cir. 2008) ("[T]he failure of the vehicle to pull over once Officer Helthinstine activated his lights and the subsequent conduct of appellant provided additional reason for him to conclude that criminal activity was indeed underfoot."). Simply avoiding the police, however, is not suspicious behavior. *See United States v. Johnson*, 620 F.3d 685, 694 (6th Cir. 2010) ("[T]here was nothing independently suspicious about Johnson's

continuing to walk toward the white car when [law enforcement] approached."); *United States v. Patterson*, 340 F.3d 368, 372 (6th Cir. 2003) ("We believe that Patterson walking away from the police when they got out of their unmarked car constitutes a factor to be outrightly dismissed. Patterson's behavior is innocent and insufficient to provide the police with reasonable suspicion.").

Here, Jackson argues that his behavior was not suspicious because there are reasons that could explain why he drove away when Aydelott arrived at the market. Under Supreme Court precedent, "[a] determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct." *Arvizu*, 534 U.S. at 277.

While Aydelott did not see the occupants of the Jeep engage in any illegal behavior, he did see the parked Jeep take off at an elevated speed after he made eye contact with the passenger and the Jeep did not stop when the Aydelott activated his lights. Instead, Jackson turned and traveled down a side road (albeit slowly) and did not stop until after the passenger jumped out of the vehicle and fled. In fact, Jackson continued a few feet down the road after the passenger jumped out of the Jeep before he stopped. Even if Jackson did not see Sergeant Aydelott's lights on the highway, as he told Aydelott, he eventually saw the lights when he turned off the highway but continued driving because, as he explained to the Sergeant, Webster told him to keep going as he had a gun.

Both parties agree that Webster's flight from the Jeep is not dispositive as to whether reasonable suspicion exists. Relevant here, however, is that Jackson was the driver of the Jeep that circled the market repeatedly and in which a rifle was moved from the back to the front seat. Thus, the suspicious action of an associate, here Webster, can be relevant to the reasonable suspicion inquiry though it may not be the sole basis. *See United States v. Wilson*, 506 F.3d 488, 494–95 (6th Cir. 2007).

The reports from Lane and the evasive conduct weigh in favor of finding that reasonable suspicion existed to stop Jackson. *See Robinson*, 663 F.3d at 830–31 (6th Cir. 2011) ("We find simply that, here, the information given in the 911 call, in addition to the Petitioner's conduct when confronted by the police, sufficed to justify a stop of the Petitioner."); *see also McCauley*, 548 F.3d at 446 (affirming district court's finding of reasonable suspicion where the suspect, among other things, did not stop when the officer activated his lights and the victim provided a description of the suspect and his car to law enforcement). Considering the totality of the circumstances in the light most favorable to the court's conclusion, as we must, the court did not err in finding that reasonable, articulable suspicion of criminal activity supported the investigatory stop. *See Pearce*, 531 F.3d at 380.

**B.      Sufficiency of the Evidence for Firearm Possession**

Jackson argues that the Government's evidence was insufficient to prove beyond a reasonable doubt that he constructively possessed the rifle. We review sufficiency of the evidence challenges de novo. *United States v. Burris*, 999 F.3d 973, 976 (6th Cir. 2021), *cert. denied*, 142 S. Ct. 473 (2021). "[V]iewing the evidence in the light most favorable to the prosecution," we determine if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard is "a very heavy burden." *United States v. Barnes*, 822 F.3d 914, 919 (6th Cir. 2016) (quoting *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006)). Even circumstantial evidence "is sufficient to sustain a conviction" and does not need to "remove every reasonable hypothesis except that of guilt." *Burris*, 999 F.3d at 976 (quoting *United States v. Lowe*, 795 F.3d 519, 522–23 (6th Cir. 2015)). We cannot "reweigh the evidence, reevaluate the credibility of witnesses, or substitute our judgment for that of the jury." *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005).

To sustain a conviction under 18 U.S.C. § 922(g)(1), the Government must prove beyond a reasonable doubt that the defendant (1) was a felon, (2) knew that he was a felon, (3) knowingly possessed a firearm, and (4) the firearm traveled through interstate commerce. *United States v. Ward*, 957 F.3d 691, 696 (6th Cir. 2020). The only element in dispute here is whether Jackson knowingly possessed a firearm. The Government may show possession of the firearm "through either actual or constructive possession." *United States v. Latimer*, 16 F.4th 222, 225 (6th Cir. 2021).

Constructive possession may be established by showing that the defendant had "dominion or control over the item itself" or "dominion over the premises where the item is located." *Id.* (quoting *United States v. Wheaton*, 517 F.3d 350, 367 (6th Cir. 2008)); *United States v. Bailey*, 553 F.3d 940, 944 (6th Cir. 2009). Constructive possession requires "specific intent," *Bailey*, 553 F.3d at 945 (quoting *United States v. Newsom*, 452 F.3d 593, 606 (6th Cir. 2006)), and can be proven by circumstantial evidence, *United States v. Davis*, 577 F.3d 660, 671 (6th Cir. 2009). Importantly, mere presence alone does not demonstrate "the requisite knowledge, power, or intention to exercise control over the [firearm]." *Bailey*, 553 F.3d at 945 (quoting *United States v. Birmley*, 529 F.2d 103, 107–08 (6th Cir. 1976)). But presence with "other incriminating evidence . . . will serve to tip the scale in favor of sufficiency." *Birmley*, 529 F.2d at 108. Possession "need not be exclusive but may be joint." *United States v. Covert*, 117 F.3d 940, 948 (6th Cir. 1997) (quoting *United States v. Beverly*, 750 F.2d 34, 37 (6th Cir. 1984)).

As the Government concedes, Jackson's proximity to the rifle is insufficient on its own to sustain a conviction, but it can "be a factor to be considered by the reviewing court." *Newsom*, 452 F.3d at 610. So, the proximity between Jackson and the rifle is a part of the analysis of whether Jackson constructively possessed the rifle. We have explained that the closer the defendant is to

the firearm, the less corroborating evidence the Government needs because in close proximity, "the inference of dominion and control is particularly strong." *United States v. Grubbs*, 506 F.3d 434, 440 (6th Cir. 2007). On the opposite end of the spectrum, "the less evidence tying a defendant to a gun at the time of arrest, the greater the circumstantial evidence must be to support a conviction." *Id.* Here, Aydelott testified (and the body camera footage reflected) that the rifle was within arm's length of the driver's seat and was accessible from his position through the space between the front driver and passenger seats.

The Government relies on four pieces of additional evidence supporting its contention that the trial evidence was sufficient to convict Jackson. First, the Jeep that Jackson drove was not registered in his name but was in his wife's name. *See Bailey*, 553 F.3d at 949 (explaining that other incriminating evidence includes "the fact that the defendant not only drove the car but also had the car registered in his name"). Though Jackson did not exercise dominion of the Jeep based on personally holding title, our caselaw shows that other incriminating evidence can include a defendant driving a vehicle registered to a spouse. *See United States v. Player*, 201 F. App'x 331, 335 (6th Cir. 2006) (explaining that evidence that supported conviction of the defendant included that the defendant was driving a car registered to his spouse and the firearm was found within arm's reach from the driver's seat).

Second, the rifle was lying in plain view directly behind the two front seats with nothing covering it. Lane testified that she saw Webster move the rifle from the back of the Jeep to the front seat but also that she did not see Jackson touch the rifle. Nor was the rifle ever fingerprinted. Jackson maintained that he had not seen the gun, but that Webster told him earlier that he had one. Sergeant Aydelotte, however, testified that when he asked Jackson where the gun was located, Jackson responded that he believed Webster had the gun on his person. "[A] defendant's statement

to police suggesting that he had knowledge of the firearm" can also serve as incriminating evidence. *Bailey*, 553 F.3d at 949. It therefore follows that a jury could infer that Jackson was aware of the rifle in the Jeep based on: (1) a witness observed Webster moving the rifle to the front seat of the Jeep where Jackson was in the driver's seat, and (2) Jackson's statement to the Sergeant that he thought Webster had the gun when he jumped out of the car.

Third, the Government argues that it presented evidence at trial that, viewed in the light most favorable to it, shows that Jackson fled from Sergeant Aydelott, which provides evidence of guilt. The court gave a flight instruction that Jackson objected to at trial, but he does not challenge the instruction on appeal.

We have held that "'flight' is generally admissible as evidence of guilt, and that juries are given the power to determine 'how much weight should be given to such evidence.'" *United States v. Touchstone*, 726 F.2d 1116, 1119 (6th Cir. 1984) (quoting *United States v. Craig*, 522 F.2d 29, 32 (6th Cir. 1975)). And "evasive conduct" can be additional evidence that establishes constructive possession. *See Newsom*, 452 F.3d at 610 (quoting *United States v. Alexander*, 331 F.3d 116, 127 (D.C. Cir. 2003)). We have found sufficient evidence to convict a defendant of being a felon in possession of a firearm in a vehicle where the defendant was driving the car, and he (among other things) tried to flee from police. *See United States v. Motley*, 93 F. App'x 898, 901 (6th Cir. 2004); *see also United States v. Newland*, 243 F. App'x 151, 154 (6th Cir. 2007).

Jackson correctly notes that Sergeant Aydelott did not testify that he was speeding, but the record does show that Jackson continued driving after the police cruiser's lights were activated. The Sergeant testified that when he activated his lights and pursued Jackson on the highway, Jackson did not stop then, nor did he stop when he turned off the highway or when the passenger jumped out; instead, he continued for another 20 to 25 feet. Though the U.S. Supreme Court and

our court have rightly expressed skepticism about the probative value of flight evidence, *see Parker v. Renico*, 506 F.3d 444, 450 (6th Cir. 2007), it is not this court's role to reweigh the evidence. The jury was entitled to weigh this evidence in conjunction with the additional evidence presented at trial.

Fourth, the Government argues that Jackson gave an implausible explanation when he told Sergeant Aydelott that Webster had taken the rifle, a weapon of considerable length, when he jumped out of the car. More importantly, the statement indicates Jackson was aware that the rifle was in the Jeep. While Jackson argues that his was not an implausible explanation, it was within the jury's province to evaluate the plausibility of this evidence.

This presents a close case as to whether constructive possession was established. The key to resolving the issue lies in our standard of review following a jury determination. We are required to view the evidence in the light most favorable to the prosecution. *Burris*, 999 F.3d at 976. The totality of the evidence includes Jackson's proximity to and knowledge of the weapon, his dominion over the car, and his flight or failure to stop. "[V]iewing the evidence in the light most favorable to the prosecution," we must ask if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. A "rational trier of fact could have found" that Jackson knowingly possessed a firearm beyond a reasonable doubt. *See Burris*, 999 F.3d at 976 (quoting *Jackson*, 443 U.S. at 319).

## III.   CONCLUSION

Because the *Terry* stop was constitutional and there was sufficient evidence to convict Jackson at trial, we **AFFIRM** the district court.